[No. B139066. Second Dist., Div. Two. Dec. 18, 2002.]

THE PEOPLE ex rel. BILL LOCKYER, as Attorney General, etc.,
Plaintiff and Respondent, v.
FREMONT LIFE INSURANCE COMPANY, Defendant and Appellant.

## COUNSEL

Horvitz & Levy, David M. Axelrad, Lisa Perrochet, Loren Homer Kraus; Woolls & Peer, Paul Woolls and Gregory B. Scher for Defendant and Appellant.

Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, Herschel T. Elkins, Assistant Attorney General, Albert Shelden, Michael R. Botwin, Michele R. Van Gelderen, Margaret Reiter and Seth E. Mermin, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

## DOI TODD, J.—

### INTRODUCTION

In a bench trial the court found Fremont Life Insurance Company (appellant) had violated Business and Professions Code section 17200 et seq., the "unfair competition law," in connection with the sale of certain annuity policies. The trial court imposed approximately $2.5 million in civil penalties, granted injunctive relief, and required appellant to offer restitution. Appellant contends that the civil penalties should be reversed as an abuse of discretion and a violation of constitutional due process; that the restitution provisions should be reversed because not all consumers were harmed by appellant's violations and on the ground that the restitution order constitutes an excessive, double punishment; and that the restitution notification requirements should be modified. We affirm the judgment.

## BACKGROUND

Appellant concedes that substantial evidence supports the findings of the trial court. The following factual summary is based on the statement of decision.

Appellant and the Alliance for Mature Americans (AMA) "combined in various ways unlawfully to sell inter vivos trusts and annuities primarily to senior citizens." AMA first solicited potential consumers through mass mailings or telemarketing techniques, offering free consultations about living trusts in their residences. An AMA representative would then visit a prospect and identify himself or herself as a "certified trust advisor" or as an expert in estate planning. The representative would offer to sell the prospect an estate plan, which would include standardized forms, many of which were based on California statutory forms but without cautionary and instructive information. The documents included an inter vivos trust, pour-over will, and various powers of attorney. When the documents were delivered at a later date, the representative presented the documents for signature and notarized some of them. During this encounter, the person delivering the documents, who at that point was a life insurance agent of appellant, would engage in efforts to persuade the consumer to purchase an annuity policy. "From the start of their contact with each prospect, AMA and the representatives had the intention of trying to sell an annuity," which was their major goal and "dwarfed everything else of value, including the consideration paid for the estate plan and the commission arising from the estate plan sale." The representatives did not identify themselves as life insurance agents and did not advise the prospective purchaser that the ultimate goal was to sell the annuity policy and earn a commission from that sale.

The relationship between appellant and AMA and their conduct resulted in the unauthorized practice of law and unfair, fraudulent, and deceptive business practices in the marketing of annuity policies that, in turn, were deceptive.

Respondent filed suit against appellant and other defendants pursuant to Business and Professions Code section 17200 et seq., the "unfair competition law," hereafter, the UCL.[1] The complaint alleged, inter alia, that appellant had violated the UCL based upon its involvement in various acts of

---

[1] All statutory references are to the Business and Professions Code unless otherwise stated.

unfair competition (§ 17200) and the making of untrue or misleading statements (§ 17500).[2]

The trial court agreed, finding appellant violated sections 17200 and 17500 based on "three sets of circumstances, each of which is independently adequate": (1) Appellant was involved in the unauthorized practice of law; (2) Appellant "was involved in an unfair, fraudulent, and deceptive business practice in the marketing of its annuities, i.e., the indication by its sales agents, pursuant to training, that they were advisors on matters of estate planning by the use of inter vivos trusts, rather than salespersons who had the ultimate goal of selling annuity policies to the customers, and the indication that AMA was an organization of senior citizens or an organization which functioned on behalf of senior citizens, rather than [a] sales organization, all of which was likely to deceive"; and (3) Appellant "marketed an annuity policy which was misleading and deceptive in its failure clearly to describe the full economic consequences of early withdrawal of funds and was therefore likely to deceive."

In addition to ordering injunctive relief, the trial court imposed a civil penalty of $210 for each violation of section 17200 and for each violation of section 17500, enhanced by an additional $210 per violation because senior citizens were targeted (§ 17206.1; fn. 14, *post*), for a total of $2,543,000.[3] The trial court stated that the civil penalty imposed closely reflected "the seriousness and harmfulness of the violations" and that the "gross amount . . . is an appropriate remedy based on the various factors material to setting such an amount, which are essentially undisputed between the sides." It also ordered restitution and notice of restitution.

This appeal followed.

---

[2]Section 17200 reads: "As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code."

Section 17500 reads as here pertinent: "It is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this state . . . any statement, concerning that real or personal property or those services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . . ."

[3]Section 17203 provides for injunctive relief. Section 17206 mandates a maximum civil penalty of $2,500 for each violation of the section 17200 prohibition against unfair competition. Section 17500 mandates a maximum civil penalty of $2,500 for each violation of its prohibition against false or misleading statements.

DISCUSSION

Appellant makes the following contentions: I. The civil penalty should be reversed on the grounds that it violates due process requirements, is an abuse of the trial court's discretion, and is not necessary as a deterrent; II. The restitution order should be reversed because not all annuitants were deceived or harmed, and on the additional ground that it is an excessive, double punishment; and III. The notification of restitution should be modified.

## I. *The Civil Penalty*

 Appellant contends the imposition of the civil penalty violates federal due process, constitutes an abuse of discretion, and is not necessary as a deterrent.

### A. *Due Process*

The Fourteenth Amendment to the federal Constitution prohibits states from depriving any person (including a corporation) of property without due process of law. (See generally 7 Witkin, Summary of Cal. Law (9th ed. 1988) Constitutional Law, §§ 481-483, pp. 668-670.) Appellant argues the civil penalty imposed in the instant case violates the federal procedural due process requirement on the ground that the broad authority granted courts under the UCL denies defendants fair notice that specific conduct may subject them to imposition of a substantial penalty, and on the additional ground that the civil penalty imposed is grossly excessive.

 The standard of review of constitutional questions is independent judgment, "but with deference to underlying factual findings, which we review for substantial evidence, viewing the record in the light most favorable to the ruling [citations]." (*City and County of San Francisco v. Sainez* (2000) 77 Cal.App.4th 1302, 1313 [92 Cal.Rptr.2d 418].) "[A] statute is presumed to be constitutional and . . . it must be upheld unless its unconstitutionality 'clearly, positively and unmistakably appears.' [Citations.]" (*Hale v. Morgan* (1978) 22 Cal.3d 388, 404 [149 Cal.Rptr. 375, 584 P.2d 512].)

 The primary purpose of the UCL is " 'the preservation of fair business competition.' [Citations.]" (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180 [83 Cal.Rptr.2d 548, 973 P.2d 527] (hereafter *Cel-Tech*).) This purpose includes " 'the right of the *public* to protection from fraud and deceit.' " (*Barquis v. Merchants Collection Assn.* (1972) 7 Cal.3d 94, 110 [101 Cal.Rptr. 745, 496 P.2d 817];

see also *Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 209-210 [197 Cal.Rptr. 783, 673 P.2d 660].)

*Sufficiency of Notice*

Appellant argues that the UCL did not afford appellant sufficient notice that various acts would result in a substantial civil penalty.

As quoted in the margin, section 17200 states in part: "As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice . . . ." (§ 17200; fn. 2, *ante.*) Written in the disjunctive, this language "establishes three varieties of unfair competition." (*Podolsky v. First Healthcare Corp.* (1996) 50 Cal.App.4th 632, 647 [58 Cal.Rptr.2d 89].)

With respect to the *unlawful* prong, "[v]irtually any state, federal or local law can serve as the predicate for an action" under section 17200. (*Podolsky v. First Healthcare Corp., supra,* 50 Cal.App.4th at p. 647; see, e.g., *People v. Landlords Professional Services* (1989) 215 Cal.App.3d 1599 [264 Cal.Rptr. 548] [unauthorized practice of law].) " '[I]n essence, an action based on Business and Professions Code section 17200 to redress an unlawful business practice "borrows" violations of other laws and treats these violations, when committed pursuant to business activity, as unlawful practices independently actionable under section 17200 et seq. and subject to the distinct remedies provided thereunder.' " (*Farmers Ins. Exchange v. Superior Court* (1992) 2 Cal.4th 377, 383 [6 Cal.Rptr.2d 487, 826 P.2d 730], disapproved on another point in *Cel-Tech, supra,* 20 Cal.4th at p. 185.) The UCL remedies and penalties are cumulative to those imposed under the other laws. (*Ibid.*; § 17204.)

As to the second prong, the California Supreme Court has not yet developed or approved a definition regarding what is *unfair* in the context of a UCL suit involving injury to consumers. (*Cel-Tech, supra,* 20 Cal.4th at pp. 184-187 & fn. 12.) The court has cautioned that in deciding what is *unfair*, "courts may not apply purely subjective notions of fairness." (*Id.* at p. 184.) This prong is "intentionally broad, thus allowing courts maximum discretion to prohibit new schemes to defraud. [Citation.]" (*State Farm Fire & Casualty Co. v. Superior Court* (1996) 45 Cal.App.4th 1093, 1103 [53 Cal.Rptr.2d 229].) The *unfairness* prong has been employed to enjoin deceptive or sharp practices. (*Samura v. Kaiser Foundation Health Plan, Inc.* (1993) 17 Cal.App.4th 1284, 1299, fn. 6 [22 Cal.Rptr.2d 20]; see, e.g., *Committee on Children's Television, Inc. v. General Foods Corp., supra,* 35 Cal.3d 197, & *People v. Bestline Products, Inc.* (1976) 61 Cal.App.3d 879,

915 [132 Cal.Rptr. 767].) The court also has determined that *unfair* business practices include unconscionable provisions in standardized agreements. (*People v. McKale* (1979) 25 Cal.3d 626, 634-637 [159 Cal.Rptr. 811, 602 P.2d 731] [tenants of mobilehome park required to sign documents that include illegal provisions].)[4]

Finally, the *fraud* prong of section 17200 "bears little resemblance to common law fraud or deception." (*State Farm Fire & Casualty Co. v. Superior Court, supra,* 45 Cal.App.4th at p. 1105.) Under section 17200, "[t]he test is whether the public is likely to be deceived. [Citation.] This

---

[4]In *Cel-Tech, supra,* 20 Cal.4th 163, a section 17200 unfair competition case, the court developed a definition but expressly limited it to anticompetitive cases and excluded cases such as the one at bar involving injury to consumers. The court defined "unfair" as follows: "When a plaintiff who claims to have suffered injury from a direct competitor's 'unfair' act or practice invokes section 17200, the word 'unfair' in that section means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." (*Cel-Tech,* at p. 187 & fn. 12.)

The *Cel-Tech* court disapproved the definition of "unfair" proposed in *People v. Casa Blanca Convalescent Homes, Inc.* (1984) 159 Cal.App.3d 509 [206 Cal.Rptr. 164, 53 A.L.R.4th 661] (*Casa Blanca*). Therein, the People charged that it was both unlawful and unfair under section 17200 that there was insufficient staff at the defendant's facilities. Relying upon *FTC v. Sperry & Hutchinson Co.* (1972) 405 U.S. 233 [92 S.Ct. 898, 31 L.Ed.2d 170] (*Sperry & Hutchinson*), the *Casa Blanca* court held that an unfair business practice exists "when it offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." (*Casa Blanca,* at p. 530.) The *Cel-Tech* court criticized this wording, stating in part: "Vague references to 'public policy,' for example, provide little real guidance. ' "[P]ublic policy" as a concept is notoriously resistant to precise definition, and . . . courts should venture into this area, if at all, with great care and due deference to the judgment of the legislative branch, "lest they mistake their own predilections for public policy which deserves recognition at law." ' [Citation.]" (*Cel-Tech, supra,* 20 Cal.4th at p. 185.)

*Sperry & Hutchinson, supra,* 405 U.S. 233, describes the test for fairness as one developed by the Federal Trade Commission to determine "whether a practice that is neither in violation of the antitrust laws nor deceptive is nonetheless unfair." The test as stated by the court is as follows: " '(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen).' " (*Id.* at pp. 244-245, fn. 5 [92 S.Ct. at p. 905].) Although the *Cel-Tech* court disapproved of the version of this test found in *Casa Blanca, supra,* 159 Cal.App.3d 509, the court expressed "no view on the application of federal cases such as *FTC v. Sperry & Hutchinson Co.* . . . that involve injury to consumers and therefore do not relate to [anticompetitive] actions like this one." (*Cel-Tech, supra,* 20 Cal.4th at p. 187, fn. 12.)

The *Cel-Tech* court also disapproved the definition of "unfair" as set forth in *State Farm Fire & Casualty Co. v. Superior Court, supra,* 45 Cal.App.4th at page 1104: "[T]he court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim . . . ." (*Cel-Tech, supra,* 20 Cal.4th at p. 184.)

means that a section 17200 violation, unlike common law fraud, can be shown even if no one was actually deceived, relied upon the fraudulent practice, or sustained any damage. [Citation.]" (*State Farm Fire & Casualty Co.*, at p. 1105.)

As set out above, the trial court found three separate and independent sets of circumstances wherein appellant had violated the UCL. As will appear, only the third set is relevant to appellant's notice argument.

### Unauthorized Practice of Law

First, the trial court found appellant had violated section 17200 by engaging in the unauthorized practice of law, a violation of section 6125. This set of circumstances comes within the *unlawful* prong of section 17200. Appellant makes no argument that section 6125 fails to give adequate notice of its prohibitions.[5]

### Deceptive Marketing Techniques

Second, the trial court found appellant had violated section 17200 through its agents engaging in particular marketing techniques that involved untrue or misleading statements. The trial court included in this set of circumstances its express findings that sales agents had represented, pursuant to their training, that they were estate planning advisors by virtue of the inter vivos trust product they were offering, "rather than salespersons who had the ultimate goal of selling annuity policies to the customers." They also made representations that AMA was "an organization of senior citizens or an organization which functioned on behalf of senior citizens, rather than [a] sales organization . . . ." Here, knowingly untrue or misleading statements made with the intent to induce the public to enter into obligations with respect to appellant's annuity policy product come squarely within the prohibitions of section 17500, set forth at footnote 2, *ante*. Appellant makes no argument that section 17500 fails to give adequate notice of its prohibitions.

### Misleading and Deceptive Statements of Costs

With regard to the third set of circumstances, the trial court determined with reference to the "premium charge" that appellant had marketed an annuity policy that was "misleading and deceptive in its failure clearly to

---

[5]Section 6125 reads: "No person shall practice law in California unless the person is an active member of the State Bar."

describe the full economic consequences of early withdrawal of funds and was therefore likely to deceive." The trial court expressly found the following facts, which are included in the statement of decision: "[Appellant's] annuity policies are misleading in the sense that they do not adequately disclose information [regarding] the premium charge. Such a charge is unusual as [expert] witness Vincent Gallagher testified. Information about the premium charge is not conspicuously set forth in the policy, which was, after all, targeted for sale to senior citizens. The sales brochures did not remedy this deficiency. . . . [Appellant's] application did not do so either. . . . [Appellant] went so far as to remove from its periodic statements information showing the amount of the charges which would be made in the event of early surrender of the policy . . . ."

Both the *unfair* prong and the *fraud* prong of section 17200 apply to this third set of circumstances. The likely difficulty a consumer would experience in attempting to ascertain the financial impact of the "premium charge" of appellant's annuity policy is *unfair* in the sense of a "deceptive or sharp practice[]" (*Samura v. Kaiser Foundation Health Plan, Inc., supra,* 17 Cal.App.4th at p. 1299, fn. 6) and also as an unconscionable provision in a standardized agreement (*People v. McKale, supra,* 25 Cal.3d at pp. 634-637). The fact that the information about the premium charge was "not conspicuously set forth in the policy" and that the policy was "likely to deceive" also brings this set of circumstances within the *fraud* prong of section 17200. (*State Farm Fire & Casualty Co. v. Superior Court, supra,* 45 Cal.App.4th at p. 1105.)

With regard to this third set of circumstances, we conclude that the record sufficiently supports the court's finding that appellant had fair notice that the premium charge would result in such liability. Substantial evidence also supports the findings of the trial court that appellant was notified that its annuity policy included language disapproved by the Department of Insurance (DOI), thus providing fair notice that sale of the annuity policy in that form could subject appellant to civil fines pursuant to the UCL.

On or about August 9, 1994, appellant authorized the actuarial firm of Lewis & Ellis, Inc., to file its annuity policy documents, including the application and brochures, with the DOI for approval. Lawrence Scott, assistant vice-president of Lewis & Ellis, Inc., handled the filing project. Appellant's contact person for the filing project was Gene Berry, head of appellant's data processing department. Scott's secretary routinely gave appellant copies of all DOI correspondence sent and received.

In response to an initial filing attempt, John Gilchrist of the DOI communicated to Scott that the premium charge mentioned in appellant's annuity

policy should be disclosed more prominently by inclusion on the specification page of the annuity policy, and that it should be evident that the premium charge was distinct from the surrender charge. Scott notified Berry of these requirements and indicated he would resubmit the policy when he received the changes from appellant. Scott later received a modified specification page that included additional information on the premium charge. DOI wrote Scott in response to the resubmission: "Not accepted for filing, renaming a surrender charge a premium charge is misleading and deceptive." Scott contacted appellant, and additional changes were made.

A September 6, 1994 letter from Scott to Gilchrist enclosed a revised policy specifications page. The letter indicated a copy had been sent to Berry. Gilchrist returned the letter to Scott with a handwritten note: "The reference to a premium charge page 7 needs explanation or removal." Scott rewrote one paragraph of page 7 of the policy "to fully explain" the premium charge "so the [DOI] will accept the policy for filing." Scott faxed the suggested paragraph to Berry. Berry put the change "into the contract form."

An October 17, 1994 letter from Scott to Gilchrist, a copy of which was sent to Berry, included the final changes. Gilchrist responded with a request for two complete "John Doe specimens." Scott complied by letter dated October 28, 1994. The specimens enclosed included a hypothetical that Berry had been involved in creating.

With respect to approximately 4,000 annuity policies that appellant sold, all included the following language, which had been *disapproved* by the DOI: "Premium charge—5 percent of the premium applied in the first contract year." Appellant concedes that none of the policies sold included the DOI-approved statement: "SURRENDER CHARGE RELATED TO FIRST YEAR PREMIUM—5 percent of the premium applied in the first contract year (see premium charge on page 7)."

Expert witness Vincent Gallagher, Ph.D., an actuary experienced in analyzing annuity contracts, testified at trial that a "very unusual" feature of appellant's annuity policy was "two separate surrender charges that have different names." The second surrender charge was called a "premium charge," which was "a very unusual term." Dr. Gallagher was accustomed to seeing surrender charges disclosed on the front page of policies. However, the "premium charge" was mentioned on page 4 of the annuity policy, on what sometimes is referred to as a "specification page." Dr. Gallagher testified: "When I first read this policy and saw the premium charge, I, at first, thought that the lines below it [on page 4] referred to it and explained

it more fully, but they don't. [¶] To find out what the premium charge is, one has to go into the body of the [annuity policy] on page 7. [¶] The bottom [of page 4 of the annuity policy] refers to the other surrender charge, which is called a surrender charge and more common[ly] what one would expect to see in the [annuity policy]." After reading page 7 of the annuity policy, Dr. Gallagher understood "[t]o some extent, but not entirely" what the "premium charge" was. Dr. Gallagher also testified that the annuity policy "has particularly high surrender charges and over a long duration of time." Annuity policies commonly waive surrender charges on death, but appellant's annuity policies did not.

We conclude that substantial evidence supports the findings of the trial court that the annuity policy was "misleading and deceptive" and therefore "likely to deceive." This evidence also demonstrates that appellant was on notice over a period of several months that the DOI had expressly disapproved specific language in its annuity policy.

In light of the foregoing we are satisfied that the UCL as applied to this case did not violate the federal procedural due process notice requirement. Thus, this third set of circumstances, involving misleading and deceptive language in the annuity policy, supports the judgment of the trial court that appellant violated section 17200, as well as the first and second sets of circumstances, involving the unauthorized practice of law and the use of untrue or misleading statements in the marketing techniques, respectively.

### *The Civil Penalty Is Not Grossly Excessive*

■ Appellant argues that the civil penalty violates federal due process on the additional ground that it is grossly excessive in relation to the state's interest in protecting its consumers. The cases upon which appellant relies are distinguishable and do not support appellant's position.

Appellant's reliance on *BMW of North America, Inc. v. Gore* (1996) 517 U.S. 559 [116 S.Ct. 1589, 134 L.Ed.2d 809] (*BMW v. Gore*) is misplaced because the guidelines there address the propriety of a punitive damage award, not a civil penalty.[6] Although the case refers to civil penalties, the references relate to the plaintiff's argument that a large punitive damage

---

[6]*BMW v. Gore* sets out the following guidelines. "[T]he degree of reprehensibility of the nondisclosure; the disparity between the harm or potential harm suffered by [plaintiff] and his punitive damages award; and the difference between this remedy and the civil penalties authorized or imposed in comparable cases." (*BMW v. Gore, supra*, 517 U.S. at pp. 574-575 [116 S.Ct. at pp. 1598-1599].)

award was necessary to induce change in the defendant's nationwide policy regarding nondisclosure of certain presale vehicle repairs. The court rejected the plaintiff's position because, regardless of whether the award was one of punitive damages or statutory penalties, under "principles of state sovereignty and comity," the plaintiff's approach would allow one state to "impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States." (*BMW v. Gore*, at p. 572 & fn. 17 [116 S.Ct. at p. 1597].) *BMW v. Gore* also refers to civil penalties for purposes of comparison with punitive damage awards to evaluate whether the awards were excessive. But *BMW v. Gore* does not apply the guidelines to civil penalties.

Appellant suggests that certain language in *Hale v. Morgan, supra,* 22 Cal.3d 388, is applicable and supports its position. In that case, Hale moved his trailer into a small trailer park without the knowledge or consent of the owner of the trailer park. The parties later agreed Hale could stay in exchange for $65 a month rent, which Hale failed to pay. The owner then acted to deprive Hale of utility services in an effort to evict him. After further disagreement between the parties, the matter went to trial. The trial court found the owner in violation of former Civil Code section 789.3, which mandated a $100 fine for each day a landlord interrupted utility services with the intent to terminate occupancy, and imposed penalties totaling $17,300.

On review, the California Supreme Court expressed concern that the statute did not permit the trier of fact to exercise discretion in fixing the penalty, thereby ignoring the culpability of the landlord and other possibly mitigating factors. (*Hale v. Morgan, supra,* 22 Cal.3d at pp. 399-404.) It reversed the judgment and remanded the matter for retrial of the penalty issue, holding that the total penalty imposed was confiscatory and "wholly disproportionate to any discernible and legitimate legislative goal, and is so clearly unfair that it cannot be sustained." (*Id.* at p. 405.)[7]

As appellant acknowledges, *Hale v. Morgan, supra,* 22 Cal.3d 388, applies where a statute does not permit any discretion in determining the amount of the penalty. (See, e.g., *People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 313 [58 Cal.Rptr.2d 855, 926 P.2d 1042]; *Suman v. BMW of North America, Inc.* (1994) 23 Cal.App.4th 1, 11 [28 Cal.Rptr.2d 133].) Appellant concedes that section 17206 confers discretion on the trial court in

---

[7]The year after *Hale v. Morgan* was decided the Legislature amended Civil Code section 789.3 to provide that the landlord would be liable to the tenant in a civil action for an amount "not to exceed $100" for each day the landlord remained in violation of the provisions of the statute but required a minimum award of $250 for each cause of action. (Stats. 1979, ch. 333, § 1, p. 1191.)

setting the civil penalty.[8] We also note the UCL includes section 17500, which in itself confers discretion by setting a maximum fine for each violation.[9]

Appellant also cites *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.* (2001) 532 U.S. 424 [121 S.Ct. 1678, 149 L.Ed.2d 674], and cases cited therein in support of its position that the issue whether the civil penalty is excessive must be reviewed de novo. But these cases can be distinguished from the case before us. *Cooper Industries, Inc.,* is a punitive damages case. *Solem v. Helm* (1983) 463 U.S. 277 [103 S.Ct. 3001, 77 L.Ed.2d 637], overruled by *Harmelin v. Michigan* (1991) 501 U.S. 957, 965 [111 S.Ct. 2680, 2686, 115 L.Ed.2d 836] [Eighth Amendment contains no proportionality guarantee]; *Enmund v. Florida* (1982) 458 U.S. 782 [102 S.Ct. 3368, 73 L.Ed.2d 1140], and *Coker v. Georgia* (1977) 433 U.S. 584 [97 S.Ct. 2861, 53 L.Ed.2d 982] are criminal cases in which the sentence was challenged as cruel and unusual under the Eighth Amendment of the United States Constitution. *United States v. Bajakajian* (1998) 524 U.S. 321 [118 S.Ct. 2028, 141 L.Ed.2d 314, 172 A.L.R.Fed. 705] involved a forfeiture that the trial court imposed after the defendant attempted to leave the country without reporting that he was transporting more than $10,000, in knowing violation of title 18 of the United States Code section 982(a)(1). The trial court found that cultural differences were implicated, and, although the entire amount ($357,144) was subject to forfeiture under the statute, ordered a lesser amount to avoid violating the excessive fines clause of the Eighth Amendment. The United States appealed, and the United States Supreme Court affirmed the trial court.

In summary, appellant relies primarily on *BMW v. Gore,* and asks this court to "carefully examine[]" the civil penalty "in light of the constitutional

[8]Section 17206 provides as pertinent: "(a) Any person who engages, has engaged, or proposes to engage in unfair competition shall be liable for a civil penalty not to exceed two thousand five hundred dollars ($2,500) for each violation, which shall be assessed and recovered in a civil action brought in the name of the people of the State of California . . . . [¶] (b) The court shall impose a civil penalty for each violation of this chapter. In assessing the amount of the civil penalty, the court shall consider any one or more of the relevant circumstances presented by any of the parties to the case, including, but not limited to, the following: the nature and seriousness of the misconduct, the number of violations, the persistence of the misconduct, the length of time over which the misconduct occurred, the willfulness of the defendant's misconduct, and the defendant's assets, liabilities, and net worth."

[9]With regard to penalties imposed pursuant to section 17500, proscribing false or misleading advertising, that section reads in relevant part: "Any violation of the provisions of this section is a misdemeanor punishable by imprisonment in the county jail not exceeding six months, or by a fine not exceeding two thousand five hundred dollars ($2,500), or by both that imprisonment and fine."

considerations articulated" in that case. As reviewed above, *BMW v. Gore* and the other cases discussed do not support appellant's position that the civil penalty violates due process.

### B. *Discretion of the Court*

In the statement of decision, the trial court stated that the civil penalty imposed closely reflected "the seriousness and harmfulness of the violations" and that the "gross amount . . . is an appropriate remedy based on the various factors material to setting such an amount, which are essentially undisputed between the sides."

Appellant contends the trial court abused its discretion in imposing the civil penalty, arguing that the $2,543,000 amount is excessive given appellant's conduct. In support of this position, appellant asserts the following: (1) Its violations were not knowing or intentional. (2) Its involvement with AMA was not reprehensible conduct that would support the civil penalty. (3) The premium charge violation does not involve reprehensible conduct. (4) Appellant's conduct did not cause widespread or significant harm to consumers. (5) The civil penalty is excessive in light of the profit appellant obtained from its annuity business. (6) Imposition of $2.5 million in penalties is not necessary as a deterrent.

We first note the UCL requires that the remedies imposed take into consideration the equities of the case. (*People v. Superior Court (Jayhill)* (1973) 9 Cal.3d 283, 287, fn. 1 [107 Cal.Rptr. 192, 507 P.2d 1400, 55 A.L.R.3d 191].) We review the award of civil penalties to determine whether the trial court abused its discretion. (*People v. Custom Craft Carpets, Inc.* (1984) 159 Cal.App.3d 676, 686 [206 Cal.Rptr. 12].)

### 1. *Knowledge and Intent*

Appellant suggests that the UCL was unfairly applied based on its assertions that it complied with all DOI directives to clarify that the "premium charge" was a form of surrender charge, that it inadvertently sold the unapproved version due to a change in personnel that impacted its computer files, that there was no evidence appellant "intended or expected that customers would be unfairly induced to purchase its product," and that it did not learn until after litigation commenced that the disapproved language remained.

Setting aside the fact that section 17200 imposes strict liability (*Prata v. Superior Court* (2001) 91 Cal.App.4th 1128, 1137 [111 Cal.Rptr.2d 296]),

appellant's alleged inadvertence due to personnel changes does not negate the fact that it sold a version of its annuity policy that included language specifically disapproved by the DOI as likely to deceive the public. As previously discussed, appellant was clearly on notice regarding the disapproved language, and over 4,000 policies which included the deceptive language were sold. Furthermore, even after litigation commenced and appellant acknowledged that the disapproved language remained in the policy, appellant continued to collect the premium charges "[b]ecause the proper language was in the policy in one place." Appellant never voluntarily notified annuitants that it would not collect premium charges. These latter acts seriously undermine appellant's asserted inadvertence resulting from personnel changes, and support the decision of the trial court.

### 2. Reprehensible Conduct Not Required

Appellant argues that its involvement with AMA was not reprehensible conduct that would support the civil penalty imposed.

The statement of decision includes the following findings.

"9. The customers were likely to be deceived about AMA's purpose in contacting them. The AMA salespeople were trained not only to be ingratiating, but to persuade the customers that the salespeople were acting in a confidential and advisory capacity toward the customers. [¶] . . . [¶]

"14. . . . As [respondent's] attorneys correctly argued, the sales activities in the present case went well beyond [mere filling out blanks in estate planning forms], and unlawfully invade[d] the territory of practice of law. Those activities included giving of advice and the suggestions that the salespersons were able to give highly qualified expert advice and were giving such expert advice. The salespersons were trained to indicate to the customers that the estate plans would be prepared by attorneys. The salespersons were trained to organize the signing of the will, the inter vivos trust, and such other documents as were pertinent to the particular customer's case. The salespersons were trained to make follow-up calls on the customers, for the ostensible purpose of monitoring the correctness of the steps which had been previously taken and reviewing the current situation of the customers. Actually, although the salespersons gave some advice about the sufficiency of documents and made recommendations for change, the chief purpose of such visits was to find out whether the customers had additional assets which could be used to purchase another annuity. The salespersons were compensated only by the commissions paid if they sold annuities.

"15. Moreover, the reality is that customers of estate planning services really needed attorneys' advice in making the important decisions involved,

including the decisions regarding funding a trust, and needed attorneys' skill in drafting the necessary documents—but did not get that kind of advice or that kind of drafting. . . .

"16. . . . The sales method of AMA actually included the element of supposedly determining if the sales prospect qualified for an inter vivos trust, as if the salesperson were going to make a detached and professional disinterested decision on that topic.

"17. A main aspect of AMA's business method, *known to the other defendants,* was that the salespersons would be presented (and/or would present themselves) as experts and advisors (not salesperson[s] trying to make a sale of an estate plan and then of an annuity). The salespersons were instructed not to mention the word 'annuity' in the early phases of their interaction with the sales prospects; such a mention, they were told, would motivate the sales prospect at least to shy away from the interview. The salespersons were given business cards which identified them as 'trust advisors' rather than 'life insurance agents' or some similar designation. The method involved getting into the prospect's home, using the discussions regarding the estate plan and the unauthorized practice of law involved therein as the early steps to seek to gain the trust of the prospect, holding out the sales agents as advisors rather than salespersons, concealing the purpose of selling annuities,[10] using the economic information about the sales prospects obtained during the estate plan sales efforts in connection with efforts to sell [appellant's] annuity, and then selling [appellant's] annuity. This was done under the aegis of a sales organization which carried a name (Alliance for Mature Americans) connoting the idea that it was some sort of association devoted to benevolent advancement of the well-being of senior citizens.

"18. . . . [Appellant] knew of AMA's general business methods. [Appellant] is responsible for the acts of AMA under the theory of agency, and under the theory of ratification [(Civ. Code, §§ 2307, 2311)], since [appellant] accepted the substantial benefits of AMA's conduct, and designated AMA and the salespersons as its agents. The salespersons were agents of [appellant]—indeed, some salespersons sold annuities but were not actually appointed as agents, and [appellant] accepted the business nevertheless. [Citation to trial exhibits.] Persons who sell annuities must be licensed and appointed as agents by the insurer issuing the annuity. Licensing is by the Department of Insurance [(Ins. Code, § 1631)]. Only 'life agents' are authorized to transact life insurance business, including annuity business. [(Ins.

---

[10]"The financial return from selling an estate plan was much less than that potentially involved in the sale of [appellant's] annuity."

Code, §§ 32, 1622, 101.)] It is required that a formal notice be filed showing that the agent has been [ap]pointed to act for an insurer. [(Ins. Code, § 1704, subd. (a).)] If an insurer issues a policy on the application taken by a person not appointed as agent, the insurer is still liable for the acts of the person. [(Ins. Code, § 1704.5.)] [Appellant] knew of the connection between estate plan sales and annuity sales. [Citation to trial exhibit.] [Counsel for appellant] knew of the connection and purported to analyze it with particular respect to whether there was a problem regarding unauthorized practice of the law. [The president of appellant] was present at AMA meetings and went on various trips with AMA personnel. [An AMA representative] explained the connection to [appellant]." (Italics added.)

Appellant concedes it "required that each AMA agent soliciting policies on [appellant's] behalf be appointed a 'life agent' by [appellant], registered with the California Department of Insurance." Appellant also concedes it is not shielded from liability under the UCL even when its conduct was "consistent with industry standards" and it had "no clear notice" that AMA's conduct was unlawful.[11] Despite these concessions of liability, appellant argues that, in determining its culpability for the purpose of imposing the civil penalties, its conduct as it related to AMA was not *reprehensible conduct*" that would justify the amount imposed, and therefore the trial court abused its discretion.

Appellant's position is not persuasive. The trial court did not describe appellant's conduct as "reprehensible" in reaching its decision, and none of the cases appellant cites in support of its position on this issue require such a finding. (See *City and County of San Francisco v. Sainez, supra,* 77 Cal.App.4th 1302; *People v. Thomas Shelton Powers, M.D., Inc.* (1992) 2 Cal.App.4th 330 [3 Cal.Rptr.2d 34]; *People v. Dollar Rent-A-Car Systems, Inc.* (1989) 211 Cal.App.3d 119 [259 Cal.Rptr. 191]; *People v. Toomey* (1985) 157 Cal.App.3d 1 [203 Cal.Rptr. 642]; *Casa Blanca, supra,* 159 Cal.App.3d 509; *People v. Bestline Products, Inc., supra,* 61 Cal.App.3d 879;

---

[11]However, appellant makes several assertions in support of an argument that AMA's conduct should not be attributed to it, claiming the following occurred: 1. AMA presented its sales methods as "wholly-legitimate and above-board." 2. Appellant did not perceive it had an obligation to investigate or assume responsibility for AMA's sales conduct, based on industry custom and its agreement with AMA. 3. Although appellant "may have understood the general structure of AMA's sales method," it lacked knowledge of how the AMA marketing plan actually affected consumers. 4. Appellant had "no ability to observe AMA's agent training or monitor agent conduct in the field" and therefore was forced to rely on AMA information, which was not always complete or accurate. 5. Appellant's conclusion that AMA was not engaged in the practice of law was due to the complexity of the legal question in combination with AMA's misrepresentations to appellant. Appellant also notes here that the $2.5 million penalty is much greater than the $100,000 penalty imposed on AMA.

*People v. Witzerman* (1972) 29 Cal.App.3d 169 [105 Cal.Rptr. 284].) Appellant draws the "reprehensible" standard from *BMW v. Gore*, which we have previously determined is not applicable here because that case deals with the propriety of a punitive damage award rather than a civil penalty. (See fn. 6, *ante*.) Appellant's reliance on the "reprehensible" standard is misplaced. The findings of the trial court with respect to appellant are sufficient to support the penalties.

### 3. *Premium Charge Violation*

Appellant references the DOI approval process and the evidence that its noncompliance with disclosure requirements was inadvertent. Appellant again invokes the "reprehensible" standard of *BMW v. Gore* to argue that the penalty sanctions are too severe. As we have discussed, the "reprehensible" standard is not applicable.

### 4. *Harm to Consumers*

As further support for its contention that the trial court abused its discretion, appellant argues that the actual harm suffered by consumers due to its violations does not justify the penalties imposed. Appellant states respondent failed to establish that *"each* consumer" was actually harmed. Appellant asserts that, in fact, there was evidence some consumers ultimately understood that "the annuity was a long-term investment and that withdrawals would be subject to surrender penalties" because these consumers were "financially sophisticated," or had received additional advice from a source other than the agent, or did not trust the agent or believe the misrepresentations, or did not seek or rely upon the agent's legal advice. Appellant also refers to the court's finding that the "annuity and trust provided real value."[12] Based on its position that there was no evidence of "substantial public injury" stemming from its violations, appellant argues that the penalties should be set aside, citing *BMW v. Gore* and *Lane v. Hughes Aircraft Co.* (2000) 22 Cal.4th 405, 424 [93 Cal.Rptr.2d 60, 993 P.2d 388] (conc. opn. of Brown, J.). Appellant again relies solely on the "reprehensible" conduct standard of punitive damages cases. Appellant's contention is without merit.

### 5. *Relationship of Amount of Penalties Imposed to Stated Profit*

Appellant's expert testified that the proper measure of appellant's financial gain from the sale of these annuities is the difference between the

---

[12]The statement of decision included the following: "[T]here are both advantages and disadvantages connected with [appellant's] annuities—as compared with other annuities and as compared with other investments."

interest it received on the monies (or reserves) paid to it and the interest it paid out, less commissions and administrative expenses. Under this formula, appellant's pretax gain resulting from its relationship with AMA from 1994 through 1996, when appellant sold this aspect of its business to another company, totaled $627,599. Appellant notes that the $2,543,000 total of the penalties imposed is more than four times appellant's gain, and asserts that no case has affirmed such an award. Appellant states that "[c]ourts have recognized the amount of a defendant's financial gain may reflect the seriousness of a defendant's conduct and the appropriate level of punishment," and refers to two cases in support of its proposition, *People v. National Association of Realtors* (1984) 155 Cal.App.3d 578 [202 Cal.Rptr. 243] and *People ex rel. Van de Kamp v. Cappuccio, Inc.* (1988) 204 Cal.App.3d 750 [251 Cal.Rptr. 657]. Appellant argues that the only relevant measure is its representation of its "financial gain" from the subject transactions.

We disagree. The court in *People v. National Association of Realtors, supra,* 155 Cal.App.3d 578, discussed the rule that the number of violations is to be determined based upon the number of victims and the number of independent acts. (*Id.* at p. 586.) It then states: "[V]iolations calculated in this manner reasonably relate to the gain or opportunity for gain achieved by the unlawful acts and can fairly be determined through expert testimony, the facts elicited at trial and circumstantial evidence." (*Ibid.,* citing *People v. Superior Court (Olson)* (1979) 96 Cal.App.3d 181, 198 [157 Cal.Rptr. 628].) *People ex rel Van de Kamp v. Capppuccio, Inc., supra,* 204 Cal.App.3d at page 765, cites *People v. National Association of Realtors, supra,* at page 586. (See also *People v. Superior Court (Jayhill), supra,* 9 Cal.3d at p. 289 [regardless of number of misrepresentations made to each customer, penalty may not exceed $2,500 per customer].) Although *People v. National Association of Realtors* employs the term "gain," the focus of the discussion is the calculation of the number of violations. In addition, the phrase "or opportunity for gain" undermines appellant's argument since it indicates that illegal conduct that did not result in "gain" may yet support imposition of a penalty.

Furthermore, section 17206, subdivision (b), provides that in assessing the amount of a civil penalty the trial court shall consider, among other factors and if relevant, "the defendant's assets, liabilities, and net worth." (See also § 17536, subd. (b) [identical language]; *People v. Toomey, supra,* 157 Cal.App.3d at p. 25.) Appellant's "financial gain" figure, based solely on proceeds derived from its relationship with AMA was estimated by appellant's expert at approximately 50 percent of appellant's annuity business. This is a narrowly defined, significantly smaller basis than the factors

included in the statute, which require analyses of appellant's business operations as a whole.[13] Appellant's concept of "relevance" in this context is similarly narrow in that appellant limits it to the factual relationship between a measure of financial gain and each profitable transaction. But "relevance" is given broader application under the UCL. A defendant's financial condition is considered relevant to determine whether such condition precludes the imposition of a penalty considered sufficient to deter such future conduct. (*People ex rel. Van de Kamp v. Capuccio, Inc., supra*, 204 Cal.App.3d at p. 765.)

### 6. *Deterrence*

Appellant contends that the total amount of the penalties imposed cannot be justified as a deterrent, asserting that its violations were not intentional, it immediately ceased issuance of its annuities and terminated its relationship with AMA after learning of the intent of the Attorney General to file suit, and the injunction serves the purpose of deterrence. It again references the "reprehensible" conduct standard for punitive damages.

We first note that the UCL provides for injunctive relief independent of the mandatory imposition of penalties. (§§ 17203, 17206, 17535, 17536.) There is no requirement that the fact of an injunction be considered in imposing civil penalties. The UCL does require that the trial court consider, if relevant, "the nature and seriousness of the misconduct, the number of violations, the persistence of the misconduct, the length of time over which the misconduct occurred, the willfulness of the defendant's misconduct, and the defendant's assets, liabilities, and net worth." (§§ 17206, 17536.) Substantial evidence supports findings under each of these categories.

The nature of the offenses was that they were aimed at the elderly. The trial court, in fact, imposed additional penalties because senior citizens were involved. (§ 17206.1.)[14] The offenses were serious in that they impacted the financial security of these persons.

With regard to the number of violations, the statement of decision discloses that the trial court, addressing only the sales in California, found

---

[13]Appellant's expert, in explaining various calculations employed to reach the financial gain number, stated that appellant's profits for 1996 were $17 million. Appellant represents elsewhere in its brief that in 1998 it had approximately $24 million in assets and $6 million in liabilities, resulting in a net worth of less than $19 million.

[14]Section 17206.1, subdivision (a) reads as pertinent: "In addition to any liability for a civil penalty pursuant to Section 17206, any person who violates this chapter, and the act or acts of unfair competition are perpetrated against one or more senior citizens or disabled persons, may be liable for a civil penalty not to exceed two thousand five hundred dollars ($2,500) for each violation . . . ."

4,958 violations under section 17200 and 4,958 violations under section 17536, a total of 9,916 violations. From this amount, it subtracted 653 violations for situations in which no annuity policy was purchased and subtracted 120 violations for the 60 persons with whom appellant had settled, "since the court considers that the interests of those persons have been adequately dealt with by other provisions of the monetary relief . . . ." Thus, the total number of violations upon which it imposed penalties was 9,143. The mandatory language of subdivision (a) of sections 17206 and 17536, provides that "[a]ny person" in violation of the relevant provisions "shall be liable for a civil penalty." The court imposed penalties of $210 out of a maximum of $2,500 permitted under each of the applicable statutes for each violation. (§§ 17206, 17536, 17206.1.) We find no abuse here.

The misconduct was persistent and stretched over more than two years. The trial court found appellant knew of the connection between the estate plan sales and annuity sales and that its agents were engaging in the unauthorized practice of law. Appellant's willfulness is evidenced by the fact that the disapproved language remained in the annuity policy after litigation commenced and appellant continued to collect the premium charges.

The trial court acted well within its discretion in imposing the penalties.

II. *Restitution Issues*

▌ In addition to imposing the civil penalties, the trial court ordered relief pursuant to sections 17203 and 17535.[15] It enjoined numerous acts, ranging from the conduct of insurance agents in the residence of a prospective customer and disclosures in policies and brochures, to the size of the margin on the annuity policy.

In light of the decision of the trial court that the annuity policy was misleading, based in part on its findings that the "premium charge" was

---

[15]Section 17203 reads as relevant: "*Any person who* engages, *has engaged,* or proposes to engage *in unfair competition may be enjoined* in any court of competent jurisdiction. *The court may make such orders* or judgments . . . as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or *as may be necessary to restore to any person in interest any money* or property, real or personal, *which may have been acquired by means of such unfair competition.*" (Italics added.)

Section 17535 is similar and reads as pertinent: "Any person . . . [who] violates or proposes to violate this chapter may be enjoined by any court of competent jurisdiction. The court may make such orders or judgments . . . as may be necessary to prevent the use or employment by any person . . . of any practices which violate this chapter, or which may be necessary to restore to any person in interest any money . . . which may have been acquired by means of any practice in this chapter declared to be unlawful."

"unusual" and "not conspicuously set forth" in the policy or in the sales brochures, it also made a restitution order. Appellant was ordered to make an offer of restitution to each nonsettling California consumer (or beneficiary under the terms of the policy), who had purchased an annuity policy from appellant that contained a premium charge provision, regardless of whether the annuity policy has been fully surrendered. The court set the amount of restitution on an annuity policy that had not been fully surrendered as "the current account value of the annuity less only the surrender charge, but not less the premium charge and, if applicable, any premium charges that previously were incurred on such annuity" or on a fully surrendered annuity, plus legal interest on those premium charges from the date of imposition.

Appellant contends that the restitution order should be reversed on two grounds: A. Not all consumers were deceived or harmed by appellant's violations. B. The restitution order constitutes an excessive double punishment that duplicates the civil penalties. The contentions are without merit.

### A. Deception and Harm to Consumers

Appellant first argues that across-the-board restitution may not be ordered without proof that all consumers were deprived of money or property as a result of an unfair business practice. This position directly contradicts the holding of *Fletcher v. Security Pacific National Bank* (1979) 23 Cal.3d 442 [153 Cal.Rptr. 28, 591 P.2d 51]: "The general equitable principles underlying section 17535 as well as its express language arm the trial court with the cleansing power to order restitution to effect complete justice. Accordingly the statute clearly authorizes a trial court to order restitution in the absence of proof of lack of knowledge in order to deter future violations of the unfair trade practice statute and to foreclose retention by the violator of its ill-gotten gains." (*Id.* at p. 449.) Appellant argues that a later case has cast doubt on *Fletcher*, citing *Kraus v. Trinity Management Services, Inc.* (2000) 23 Cal.4th 116, 149-151 [96 Cal.Rptr.2d 485, 999 P.2d 718] (conc. & dis. opn. of Werdegar, J.). The court in *Kraus* addressed issues related to whether restitution could be ordered to a fluid recovery fund when victims of an unfair business practice cannot be identified. (*Id.* at pp. 129-132.) *Kraus* does not impact the *Fletcher* holding or the instant case with respect to an offer of restitution.

Appellant next argues that the trial court abused its discretion in ordering across-the-board restitution, asserting that the evidence does not support a reasonable inference of class-wide deception or harm. But the record is to the contrary. Expert witness Vincent Gallagher, Ph.D., an actuary experienced in analyzing annuity contracts, testified he was not able fully to

understand the premium charge based on the information in the annuity policy. This evidence alone supports the findings of the trial court that the annuity policy was "misleading and deceptive" and therefore "likely to deceive." Furthermore, as earlier discussed, *Fletcher* supports the order of restitution imposed here.

Appellant next asserts the restitution award was "unfair, inappropriate, and unnecessary to accomplish the goals of the UCL." Appellant first argues the restitution order must be reversed on the ground it will provide an unfair windfall to consumers who were not deceived. This is not a valid reason to reverse the order given the holding of *Fletcher v. Security Pacific National Bank, supra,* 23 Cal.3d at page 449 (restitution may be ordered "in the absence of proof of lack of knowledge in order to deter future violations of the unfair trade practice statute and to foreclose retention by the violator of its ill-gotten gains"). We note that the rule that restitution under the UCL may be ordered without individualized proof of harm is well settled. (See *Massachusetts Mutual Life Ins. Co. v. Superior Court* (2002) 97 Cal.App.4th 1282, 1288 [119 Cal.Rptr.2d 190]; *Prata v. Superior Court, supra,* 91 Cal.App.4th at p. 1144.)

Appellant next asserts that the order does not restore the status quo but alters the "lawful terms of the annuity contract." Appellant cites *People v. Superior Court (Jayhill), supra,* 9 Cal.3d at page 286, which states that "a court of equity may exercise the full range of its inherent powers in order to accomplish complete justice between the parties, restoring if necessary the *status quo ante* as nearly as may be achieved. [Citations.]" This argument is not persuasive. While the premium charge may be considered *lawful* in itself, substantial evidence supports the finding that the annuity policy was misleading as a whole because of the premium charge term. The premium charge therefore cannot be considered *lawful* in the context of the annuity policy because the sale of the policy is in violation of the UCL. The trial court's order is reasonably calculated to restore the status quo ante by requiring appellant to offer to restore, inter alia, any premium charges imposed, and legal interest thereon from the date of imposition.

Finally, appellant argues restitution is not necessary to punish or deter appellant in light of the civil penalties imposed. We find no abuse of discretion. Imposition of civil penalties for appellant's transgressions is mandatory. (§§ 17206, 17536.) The trial court may order restitution of money "which may have been acquired by means" that are violative of the UCL. (§§ 17203, 17535.) These remedies are cumulative. (§ 17205.) The trial court carefully tailored the restitution order to the harm perpetrated.

B. *The Restitution Order Does Not Constitute an Excessive Double Punishment*

Appellant argues that because it must make an across-the-board offer of restitution, the order of restitution constitutes a double punishment that is excessive. Appellant again invokes the *BMW v. Gore* reprehensible conduct standard. As previously noted, substantial evidence supports the findings of the trial court, the remedies are cumulative, the restitution order is tailored to the harm perpetrated, and we have rejected the *BMW v. Gore* standard.

III. *Restitution Notification Requirements*

The judgment requires appellant to send a letter to each person who purchased an annuity policy that contained a premium charge provision, the body of which reads:

"The California Attorney General, 21 district attorneys, 2 city attorneys and the Department of Insurance brought a civil action against [appellant] pertaining to the sale of its annuities by [AMA]. On [specify date] the Los Angeles Superior Court entered a judgment against [appellant]. The Court found that [appellant] was involved in the unauthorized practice of law, that it fraudulently marketed its annuities through agents who posed as estate planning advisors rather than insurance sales agents and that [appellant's] annuity policies and annuity applications were misleading because they did not adequately disclose information about the 'premium charge.' [¶] . . . [¶]

"The Court ordered [appellant] to allow you to withdraw all of your money, including interest, from the annuity without having to pay the 'premium charge,' one of the two penalties for early withdrawal under your annuity. The 'surrender' charge would still have to be paid.

"Your annuity has two kinds of surrender penalties that may be imposed when you surrender your annuity. They are a 'surrender charge' and a 'premium charge.' The 'surrender charge' can be as high as 10% for each of the first three years and is reduced 1% each year thereafter until it is eliminated the 12th year.

"The 'premium charge' lasts for 14 years and can be as high as 5% of the premiums paid during the first year. It is 5% for the first 10 years and is reduced 1% each year thereafter until it is eliminated in the 15th year. Both types of penalties apply either if all the money is withdrawn from the annuity or if the annuitant dies and the beneficiaries cash in the annuity before the end of the surrender period.

"Pursuant to Court order, you may cancel your annuity at any time without having to pay a premium charge. If you do cancel, you will be refunded the account value (premium amount plus interest) less surrender penalties. Enclosed is an Endorsement which reflects that order. You should attach the Endorsement to your policy. However, if you ever decide to cancel your annuity, you may still be subject to the surrender penalties.

"If you cancel and have funds paid directly to you, there may be tax consequences. If your annuity is an IRA annuity, you can ask us to transfer the refund directly to another annuity elsewhere. If your annuity was not an IRA, you can ask us to transfer the refund to another annuity elsewhere. You may wish to consult with your tax advisor.

"Sincerely,

"[Signature and title of a representative of appellant]."

Appellant objects to the form of notice and argues that language such as "fraudulently marketed" is inflammatory and seeks removal of that language. It also objects that the notice did not include finding of the trial court that the annuity policy did have "genuine value." Appellant is concerned that mass cancellations from fears about the safety of the investment will result, and cautions that such cancellations will lead consumers to incur substantial surrender penalties unnecessarily. Appellant asserts that such a result would undermine the goals of the restitution order. Appellant asks that the matter be remanded with instructions that its proposed notification letter be used or, alternatively, that language be added to reflect the additional findings of the trial court regarding the value of the annuity policy.[16]

The letter the trial court ordered is accurate and fully describes the premium charge in a readily understandable manner. It also explains the

---

[16]Appellant proposed the following language for the body of the notification letter: "The lawsuit filed by the Attorney General and State Bar of California against [AMA] and [appellant] has now been resolved. The court entered an Order which gives you an opportunity to cancel your Fremont Life annuity contract(s) without having to pay the Premium Charge referenced on pages 4 and 7 of your annuity contract. You will still have to pay the surrender charge illustrated in the table at the bottom of page 4 of your annuity contract. [¶] Your current Account Value is: $[insert account value] [¶] If you elect to cancel your annuity contract pursuant to the terms of this offer, you will receive the following amount: [¶] Account Value $[current account value] - [¶] Surrender Charge $[surrender charge] [¶] Paid To You $[amount of payment] [¶] **You have 90 days from the date of this letter to decide whether to cancel your annuity contract without paying the premium charge.** If you do not accept this offer to cancel without paying the premium charge all of your rights and options under the policy will remain the same. If you cancel, there may be tax consequences. If your annuity is an IRA annuity or you purchased the annuity as a tax free exchange under Internal Revenue Code section 1035, you can ask us to transfer your funds to another annuity

consequences of surrendering a policy. In this context, accurate statements cannot be considered inflammatory statements. Appellant failed to ensure that the version of the annuity policy it placed before the public was equally clear. We find no basis for remand.

DISPOSITION

The judgment is affirmed. Costs are awarded to respondent.

Boren, P. J., and Ashmann-Gerst, J., concurred.

A petition for rehearing was denied January 16, 2003, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied April 9, 2003.

---

elsewhere. You should consult your tax advisor if you have questions. [¶] Sincerely, [¶] [Fremont Life Representative]."