Filed 5/10/22; on rehearing

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| BARNEY THOMAS WILLIAMS, | C090436 |
| Plaintiff and Appellant, | (Super. Ct. No. 17CV03462) |
| v. | OPINION AFTER REHEARING |
| NATIONAL WESTERN LIFE INSURANCE COMPANY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Butte County, Tamara L. Mosbarger, Judge. Affirmed in part and reversed in part.

Majors & Fox, Frank J. Fox; Law Offices of Mary A. Lehman and Mary A. Lehman for Plaintiff and Appellant.

Life Insurance Consumer Advocacy Center and Brian P. Brosnahan for Life Insurance Consumer Advocacy Center as Amicus Curiae on behalf of Plaintiff and Appellant.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts IIB, IIC and IID.

1

Green Bryant & French, Joel R. Bryant; and Peter G. Lomhoff for Consumer Federation of California as Amicus Curiae on behalf of Plaintiff and Appellant.

The Vossler Law Firm and Sil Vossler for California Elder Justice Coalition as Amicus Curiae on behalf of Plaintiff and Appellant.

De Vries Law, Lizabeth N. de Vries and Kelly K. Dixon for Institute on Aging as Amicus Curiae on behalf of Plaintiff and Appellant.

Legal Aid Association of California, Zach Newman; and Patrick T. Nakao for Legal Aid Association of California as Amicus Curiae on behalf of Plaintiff and Appellant.

Hinshaw & Culbertson, Edward F. Donohue, Peter L. Isola; Davis Wright Tremaine and Spencer Persson for Defendant and Appellant.

National Western Life Insurance Company (NWL) appeals from a jury verdict holding the company liable for negligence and elder abuse arising from an NWL annuity sold to Barney Thomas Williams by Victor Pantaleoni. In 2016, Williams contacted Pantaleoni to revise a living trust after the death of Williams' wife, but Pantaleoni sold him a $100,000 NWL annuity. When Williams returned the annuity to NWL during a 30-day "free look" period, Pantaleoni wrote a letter over Williams' signature for NWL to reissue a new annuity. In 2017, when Williams cancelled the second annuity, NWL charged a $14,949.91 surrender penalty. The jury awarded Williams damages against NWL, including punitive damages totaling almost $3 million.

In our prior opinion in we reversed the judgment, concluding that Pantaleoni was an independent agent who sold annuities for multiple insurance companies and had no authority to bind NWL. We determined that Pantaleoni was an agent for Williams, not NWL.

2

Williams petitioned the California Supreme Court for review,[1] which granted review and on September 22, 2021, issued an order stating in relevant part: "The matter is transferred to the Court of Appeal, Third Appellate District, with directions to vacate its decision and reconsider its finding that Pantaleoni did not have an agency relationship with National Western Life Insurance Company in light of Insurance Code sections 32, 101, 1662, 1704 and 1704.5 and *O'Riordan v. Federal Kemper Life Assurance Company* (2005) 36 Cal.4th 281, 288. (See also Ins. Code, §§ 31 [' "Insurance agent" means a person authorized, by and on behalf of an insurer, to transact all classes of insurance *other than life*, disability, or health insurance, on behalf of an admitted insurance company' (emphasis added)], 33 [' "Insurance broker" means a person who, for compensation and on behalf of another person, transacts insurance *other than life*, disability, or health with, but not on behalf of, an insurer' (emphasis added)].)"[2]

Section 1704.5, subdivision (a) provides in relevant part that "a licensed life agent may present a proposal for insurance to a prospective policyholder on behalf of a life insurer for which the life agent is not specifically appointed, and may also transmit an application for insurance to that insurer," and "[i]f a policy of insurance is issued pursuant to that application, the insurer is considered to have authorized the agent to act on its behalf, and the insurer is responsible for all actions of the agent that relate to the application and policy as if the agent had been duly appointed for the insurer." Section 101 provides: "Life insurance includes insurance upon the lives of persons or appertaining thereto, and the granting, purchasing, or disposing of annuities."

---

[1]     We deferred ruling on Williams' request to take judicial notice of letters submitted by amici curiae to the California Supreme Court in support of his petition for review, and now deny the request as unnecessary to resolution of the appeal. (*JRS Products, Inc. v. Matsushita Electric Corp. of America* (2004) 115 Cal.App.4th 168, 174 & fn. 4.)

[2]     All undesignated statutory references are to the Insurance Code.

After the transfer order, Williams submitted a supplemental brief contending that under the Supreme Court's opinion, and the authority cited therein, the judgment should be affirmed. However, Williams continues to maintain that the trial court abused its discretion by not using plaintiff's counsel's home market rate in calculating the attorney fee award. NWL in its supplemental brief contends that it cannot be held liable for Pantaleoni's conduct in violation of the rules governing its agents.

After we issued our opinion on transfer from the California Supreme Court, both Williams and NWL filed petitions for rehearing on various grounds, which we granted.[3] Upon consideration of the petitions for rehearing, we remain confident that our prior opinion was correct and reissue that opinion with minor modifications.

We affirm the judgment finding NWL liable for negligence and financial elder abuse. However, punitive damages assessed against NWL are reversed. We find no abuse of discretion in the trial court's calculation of the attorney fee award but remand the case for the court to reconsider the award in light of the reversal of punitive damages.

---

**3** NWL briefly argues in its petition for rehearing that, after transfer from the California Supreme Court, NWL was denied an opportunity to submit a supplemental brief in response to Williams' supplemental brief. NWL filed a request for leave to submit a supplemental responding brief, which we denied. Under California Rules of Court, rule 8.200(b)(1), NWL did not need leave. The rule provides: "Within 15 days after finality of a Supreme Court decision remanding or order transferring a cause to a Court of Appeal for further proceedings, any party may serve and file a supplemental opening brief in the Court of Appeal. *Within 15 days after such a brief is filed, any opposing party may serve and file a supplemental responding brief.*" (Italics added.) We note that many of the contentions that NWL now makes in its petition for rehearing were not raised in its supplemental opening brief. New points raised for the first time in a petition for rehearing are generally deemed forfeited. (See *Gentis v. Safeguard Business Systems, Inc.* (1998) 60 Cal.App.4th 1294, 1308.) However, we have considered NWL's contentions on the merits to afford NWL on rehearing an opportunity to raise issues that could have been raised in a supplemental responding brief under rule 8.200(b)(1).

4

# I.    FACTUAL AND PROCEDURAL BACKGROUND

## A.    Pretrial Proceedings

In December 2017, Williams filed a complaint alleging claims for elder financial abuse, negligence per se, and breach of fiduciary duty against Pantaleoni.[4] Williams alleged that he contacted American Family Legal Services to update a trust and estate plan after the death of his wife. Williams received a call from Pantaleoni to set up an appointment in Williams' home. Pantaleoni identified himself as a paralegal with the company.

At the meeting in Williams' home, Pantaleoni provided Williams with a business card stating Pantaleoni was a CSA (Certified Senior Advisor) and "Managing Partner and Paralegal" with American Family Legal Services. Pantaleoni obtained Williams' trust documents and a $360 fee to update them. One week later Pantaleoni returned and obtained Williams' signature on blank documents and a blank check, which Pantaleoni filled in in the amount of $100,000 and used to purchase an annuity from NWL for Williams.

When Pantaleoni delivered the annuity, Williams decided he did not want it and returned it to NWL during a 30-day free look period. Two weeks later Pantaleoni returned with more blank documents for Williams to sign, including documents that retracted the cancellation of the annuity. When the premium was not refunded, Williams sought the assistance of a financial advisor who wrote to NWL to cancel the annuity. Because the 30-day free look period had passed, NWL refunded the premium but charged a surrender penalty.

---

[4]    Williams also alleged that, in 2015, California's Department of Insurance (DOI) filed an action against Pantaleoni for violations of the Insurance Code prohibiting misrepresentations to a senior regarding annuities. The action was resolved by an order on a stipulation in which Pantaleoni denied the allegations but agreed to a restricted license and payment of a $2,500 fine.

In February 2018, Pantaleoni answered the complaint.

In May 2018, Williams amended the complaint to add NWL in place of a Doe defendant.

In July 2018, NWL demurred to the complaint. The trial court sustained the demurrer with leave to amend. The court adopted its tentative ruling that (1) the elder abuse cause of action had not alleged facts that NWL knew Pantaleoni's conduct was likely to be harmful to Williams, as required by Welfare and Institutions Code section 15610.310, subdivision (b), and (2) the negligence per se cause of action alleged that a series of Insurance Code provisions were violated but no facts regarding how defendants violated them, including a statutory provision prohibiting misrepresentations of the terms or benefits of a proposed policy where NWL was not alleged to have made misrepresentations to Williams. "Further, the exact duty owed by NWL to Plaintiff is unclear in the pleadings."

In August 2018, Williams filed a first amended complaint. The amended complaint alleged, inter alia, that: (1) NWL knew of the DOI action against Pantaleoni and his restricted license because these were matters of public record; (2) NWL knew that Pantaleoni had filed bankruptcy three times in the last six years and was still in bankruptcy at the time of the transactions at issue; (3) NWL knew or should have known that Pantaleoni did not have errors and omissions insurance coverage, contrary to NWL policy; (4) NWL knew or should have known that Pantaleoni operated " 'living trust mills' "[5] to gain access to seniors and sell annuity products, which NWL knew was unlawful, and that Pantaleoni was selling insurance products using a company named

---

[5] A " 'living trust mill' " involves "salespeople, posing as experts in estate planning, engage[ing] in the unlawful practice of law, advis[ing] senior citizens to establish a living trust, and to invest in . . . annuities." (*People ex rel. Lockyer v. Fremont General Corp.* (2001) 89 Cal.App.4th 1260, 1263.)

6

Sierra Legal Services; (5) NWL knew that Pantaleoni would earn a $9,500 commission from the sale of an annuity based on a 13-year surrender period, which was inappropriate for someone Williams' age; and (6) Williams' April 5, 2017 letter instructing NWL to cancel the annuity complained about Pantaleoni's misconduct, but NWL did not investigate or terminate Pantaleoni and charged a surrender penalty of $14,949.91.

In addition, Williams alleged that in April 2016 he sent a mispunctuated, misspelled handwritten note to NWL to return the first annuity, but the handwriting of the letter Pantaleoni forged to complete the application for the second annuity contrasted starkly with the first note, which Williams asserted "was a HUGE red flag of Mr. Pantaleoni's financial abuse of Plaintiff."

In September 2018, NWL demurred to the amended complaint. The trial court overruled the demurrer, stating that (1) as to the elder abuse cause of action, the amended complaint alleged the likelihood of harm to Williams in that (a) his life expectancy was less than the surrender term of the annuity, or (b) NWL possibly had notice of problems with the annuity because it received two notes in different handwriting purportedly from Williams, and (2) as to the negligence per se cause of action, the court took judicial notice of the DOI's opinion that there was a private right of action under section 785[6] and found that Williams presented "at least one theory" that NWL knew that Pantaleoni was wrongly using a legal services company to sell insurance products.

In November 2018, NWL answered the first amended complaint.

---

[6]     Section 785, subdivision (a) provides: "All insurers, brokers, agents, and others engaged in the transaction of insurance owe a prospective insured who is 65 years of age or older, a duty of honesty, good faith, and fair dealing. This duty is in addition to any other duty, whether express or implied, that may exist."

In February 2019, the trial court granted Williams' unopposed motion for leave to file a second amended complaint, which substituted a fraud claim for the breach of fiduciary claim against Pantaleoni.

**B.    The Trial**

**1.    Plaintiff's Case**

**a.    Barney Williams**

Williams testified that his wife of 46 years, Barbara, passed away in 2015. Barbara was an ex-bookkeeper who took care of paying the bills. The couple saved on average $3,000 per year.

In February 2016, Williams called the office that had prepared a trust for him, seeking someone to make changes to the trust because of his wife's death. Pantaleoni came to Williams' house. Williams said he wanted to remove his stepdaughter, Merrily Lee, from the trust and give her $25,000 of the trust benefits, with the remainder going to a homeless shelter, the Jesus Center. Williams gave Pantaleoni a check for $360 paid to American Family Legal Services for changes to the trust. Williams signed the check and Pantaleoni filled in the rest, including the words "TRUST UPDATE" on the memo line.

Pantaleoni asked Williams questions about his finances. Williams said that he had approximately $80,000 invested with a broker and $114,000 in the bank, $8,000 in checking and $106,000 in savings. Williams showed Pantaleoni the brokerage and bank statements. Pantaleoni worked on the trust papers and confirmed for Williams that the changes he requested had been made. Williams let Pantaleoni take the trust documents with him when he left.

A week later Pantaleoni came back for another meeting. At Pantaleoni's suggestion, Williams signed a paper to transfer $100,000 from his savings to his checking account and the two of them went to the bank to complete the transfer. Back at Williams' house, Pantaleoni asked for a check. Williams signed a blank check that Pantaleoni filled in. Williams knew the check was to be in the amount of $100,000. Williams did not

know what the check was to be used for. Pantaleoni assured Williams his money was safe. Pantaleoni took the check with him and some other blank documents that Williams signed. Williams thought the documents had something to do with the trust. Pantaleoni did not give Williams copies.

The documents Williams signed included an NWL annuity application, a withdrawal benefit rider and a suitability questionnaire. The suitability questionnaire stated that Williams' annual income was $24,000. Williams did not tell Pantaleoni his annual income was $24,000; his actual income was approximately $16,000 per year. A box checked on the questionnaire indicated that Williams' approximate net worth after purchase of the annuity ranged from $50,000 to $99,999, but a blank for his liquid net worth after purchase was filled in with the amount of $120,000. Williams signed and initialed but did not fill out these documents. Williams did not understand what he was signing; he thought it had something to do with the trust. Pantaleoni never told or notified Williams that Pantaleoni was an insurance agent or selling insurance products.

Williams received a bank statement in the middle of the following week. From the statement, Williams learned for the first time that the $100,000 check was made out to an insurance company.

Pantaleoni came back to deliver the annuity and Williams signed a delivery receipt. Williams read on the first page of the policy that he could return the annuity within 30 days. Williams wanted to send the annuity back because there was a 15 percent surrender penalty if the money was withdrawn within the first year, and a bit less each year thereafter for seven years. Williams did not think that in his medical condition he would survive for the surrender period. Williams sent the policy back with a handwritten note that he had received the policy and wanted to return it. The note stated: "I-WITH-LIKE-TO-RETURN-IT." (*Sic*.)

A few days later Williams heard from Pantaleoni, inquiring about the cancelled annuity. Pantaleoni said he had papers for Williams to sign regarding his stepdaughter.

9

Williams suggested Pantaleoni send the papers and he would sign them and send them back. Pantaleoni insisted on visiting Williams. Williams told Pantaleoni he would have to show Williams where to sign because he was sick and "blurry eyed." When Pantaleoni came to the house, Williams signed another annuity application. Williams also signed two letters both stating in handwritten printing that "I HAVE DECIDED TO KEEP MY ANNUITY CONTRACT . . . AND NOT CANCEL IT," and requesting that the annuity be reissued. Besides Williams' signature, none of the handwritten printing on the page was his. When he signed, it was a blank sheet of paper. Williams told Pantaleoni he did not like signing blank papers. Williams thought he was signing papers regarding his stepdaughter. Pantaleoni never delivered a reissued annuity.

Williams waited two months for the return of his money but it did not show up. Williams called NWL's office and was told the value of the annuity was now $88,000, two months after Williams paid $100,000 for it. Williams decided not to cancel the annuity so that the amount of interest would increase and could be applied to the 15 percent surrender penalty. With the help of a neighbor who had a computer, Williams checked online to see if the interest had increased.

Williams sought help to try to get his money back from NWL. He paid $500 to Mark Starr of the investment firm Edward Jones for that purpose. In March 2017, Williams signed a surrender request to NWL directing that the refund check be mailed to Edward Jones.

On April 5, 2017, Starr typed a letter to NWL signed by Williams, which stated: "I am requesting an immediate processing of the surrender request for my annuity . . . . A copy of the surrender request is included with this fax. [¶] Not only was the policy purchased without explanation of what the investment was, but the agent, Victor Pantaleoni, refused to process the policy cancelation during my 30 day free look period. [¶] Since the day I decided to surrender the policy, Mr. Pantaleoni has continually harassed me by phone and in person to keep me from cancelling the policy. His focus is

not on what is best for me, but only how his commission will be affected.  [¶]  My next step will be to file a complaint with the California Department of Insurance unless this request is processed quickly."

In May 2017, NWL sent a check to Edward Jones for the benefit of Williams in the amount of $88,056.64.

On August 28, 2017, Williams and Prescott Cole, an attorney with California Advocates for Nursing Home Reform, wrote to NWL requesting all Williams' annuity policies and related documents, as well as a final balance statement showing surrender charges.

In early September 2017, Juanita Ziebell at NWL responded to the letter from Williams and Cole.  Ziebell summarized the events regarding the initial application for the annuity in February 2016, Williams' request for a refund under the free look provision, and the subsequent letter Williams signed stating that he wanted the policy reissued.  Ziebell stated:  "At the time of your application, your agent, Victor Pantaleoni, provided you with a copy of the Consumer Information and Disclosure Brochure.  The brochure provides an overview of the policy's features, benefits, and limitations.  This includes free withdrawal options and withdrawal charge rates.  The disclosure also states that this annuity is a deferred annuity and a long term investment.  I am enclosing a copy of the signature page which you signed which states, in part, 'I have received a copy of this disclosure and I have reviewed it with my agent.  I fully understand the disclosure and specific points outlined above.' "  The letter concluded with an explanation of the surrender charges, noting that in the second policy year the charge was 14.75 percent and, as of the first anniversary of the policy, Williams had earned $3,300 at a fixed interest rate of 3.30 percent.

On cross-examination by counsel for NWL, Williams confirmed that, when he went to Starr at Edward Jones, Williams did not ask for advice on how to get a $100,000 refund, because 30 days had passed and Williams knew the refund would be about

11

$88,000, due to the surrender penalty. Williams confirmed in deposition testimony read to the jury that he received the September 2017 letter from Ziebell and read it, but accidentally burned it with his wife's papers.

### b. Dr. Stacey Wood

Dr. Stacey Wood, an expert on the susceptibility of elders to undue influence, testified that Williams was significantly susceptible to undue influence by Pantaleoni. On cross-examination by NWL, Dr. Wood confirmed that she was not testifying that undue influence actually occurred.

### c. Victor Pantaleoni

Pantaleoni's business card for his company American Family Legal Services identified him as a "CSA" and "Managing Partner/Paralegal" with the company and included insurance license numbers for California, Arizona and Nevada.

In 2005, 2009 and 2013, NWL appointed Pantaleoni as an agent in Arizona, California and Nevada.[7] Pantaleoni's 2009 and 2013 contracts with NWL stated: "We appoint you to personally procure applications for insurance for us, deliver policies issued by us and provide policyholder services as requested, all subject to our Rate Book and our Rules and Regulations. You are an independent contractor, and this agreement does not establish an employer-employee relationship." The contracts further read: "You agree to abide by our Rules and Regulations and the laws and regulations where we are licensed to sell insurance."

Pantaleoni testified that NWL had a right to terminate him if he violated any laws or regulations. NWL never terminated him.

Pantaleoni received compliance bulletins from NWL. As advised by a bulletin on estate planning services, Pantaleoni understood he (1) could not give legal advice if he

---

[7] In 2007, Pantaleoni's contract was terminated for lack of production.

did not have a law license, (2) should avoid using the sale of a living trust as a pretext to sell insurance or an annuity, (3) had to identify himself as an insurance agent in advertising and when meeting with a customer, and (4) should avoid using professional designations that imply a level of authority or expertise that he did not possess. Pantaleoni admitted that (1) he had a certification as a CSA but lost it, (2) CSA was not a designation approved by DOI, and (3) he was "negligent" in keeping "CSA" on his business card. Pantaleoni understood, as advised by an NWL bulletin, that he should not use business names that misled customers. Pantaleoni testified that he understood that it was unlawful to use pretext interviews to sell annuities, but said he did not know that it is unlawful to use a trust mill to sell an annuity, nor did he understand what constituted a trust mill.

Pantaleoni testified that he had sold 13 annuities in the 13 years he had been appointed by NWL. He was familiar with NWL's policy that for each annuity he delivered he was required to obtain a delivery receipt from the customer confirming that the policy was received.

Pantaleoni understood that in California the word "insurance" was required to appear on his business card. He agreed he sold insurance, an annuity, to Williams, and admitted he "should have had a different card."

Pantaleoni testified to his understanding that California has special Insurance Code provisions to protect people over 65. The law requires that anyone who meets with a senior in the home must deliver a notice in writing 24 hours prior to the meeting. He understood he was required to keep a copy of the notice, but he did not have one for Williams in his file. Pantaleoni testified he had asked NWL and the third party broker he was affiliated with for the notice to Williams but neither had a copy. Pantaleoni understood that a person meeting with a senior must provide a business card with identifying information and an insurance license number. He did not provide that card to Williams because he did not meet with him to sell insurance. Pantaleoni understood that

13

he could not sell a life insurance policy or annuity using a scheme that misrepresented the true status of his contact with a senior.

In 2016, Pantaleoni was the president of American Family Legal Services. In 2013, Pantaleoni surrendered his right for American Family Legal Services to transact intrastate business in California and reactivated it in 2018.

Pantaleoni's contracts with NWL provided that all records and documents associated with NWL transactions were the company's property and open to inspection. Pantaleoni could not recall, since 2016, NWL inspecting his business card, or telling him to put the word "Insurance" on it, remove "CSA," or move the word "Paralegal" away from his insurance license numbers.

In 2013, Pantaleoni provided a certificate of errors and omissions insurance to NWL. Pantaleoni did not carry errors and omissions insurance when he met with Williams in 2016 and admitted he was negligent in not doing so. Pantaleoni also admitted that he was the subject of an enforcement action by DOI in 2015.

In February 2013, Pantaleoni filled out and signed an NWL agent data sheet identifying "Sierra Attorney Services Inc." as agent and Pantaleoni as its principal. The 2013 contract Pantaleoni signed between NWL and Sierra Attorney Services Inc., identified Pantaleoni as general agent, and included his personal guarantee of Sierra Attorney Services Inc.'s obligations to NWL. In May 2013, NWL notified Pantaleoni that his requested name change from "Sierra Attorney Services" to "Victor Scott Pantaleoni" was executed and in effect. In June 2013, Pantaleoni signed an assignment of all compensation received under his contract with NWL to Sierra Attorney Services Inc.

In August 2013, Pantaleoni filed for bankruptcy. Pantaleoni was in bankruptcy proceedings when he dealt with Williams in 2016. The bankruptcy terminated in April 2016.

14

In February 2016, Pantaleoni received a $9,500 commission from NWL for selling an annuity to Williams.

Pantaleoni received a notice from NWL dated April 7, 2016, stating that Williams had returned the annuity delivered in March 2016.  The notice read:  "This request will be held for **5 <u>calendar days</u>** from today.  If the policy is conserved you must fax written notification from the policy owner to Client Services.  This will be confirmed by letter. [¶] *Comments:  Please confirm if you are able to conserve.  Return contract if you are unable to conserve.  Thanks.*"

Pantaleoni contacted NWL.  He was told (1) in order to conserve the annuity, to go to see Williams and talk about the benefits of the annuity, and (2) what paperwork NWL would need to conserve the annuity.  The term "conserve" is an insurance term for speaking with a client to see if the client would like to keep a policy.

Pantaleoni called Williams to set up an appointment to talk with him about the reasons why he wanted to return the annuity.  Williams did not tell Pantaleoni he was sick and would rather that Pantaleoni put the documents in the mail.  On April 9, 2016, Pantaleoni visited Williams in his home and gave him the second annuity application to sign.  Pantaleoni confirmed that he wrote the handwritten printed letter Williams signed stating his intention to keep the annuity.  Pantaleoni denied the letter was blank when Williams signed it.

Five days later, NWL issued a new annuity with the same policy number. Pantaleoni delivered the second annuity.  Pantaleoni testified that Williams signed a delivery receipt for the second annuity.  Pantaleoni denied that he did not deliver the second annuity so Williams would not have a chance to return it.

On cross-examination by NWL, Pantaleoni testified that he had life insurance agent appointments from multiple insurance carriers.  No insurance company had ever asked to review his business card.  Every insurance company reviewed the form of

Pantaleoni's 24-hour notice letter but no company ever asked to review the 24-hour notice from a specific sale.

Pantaleoni formed Sierra Attorney Services in Nevada to provide paralegal services to attorneys. The name was approved by the Nevada Department of Insurance. Pantaleoni only sold insurance products in California under his own name. The DOI in California required him to use his own name.

Williams wanted an annuity because his stepdaughter was abusing him and he wanted to keep money away from her. Pantaleoni made a recommendation on a solution for Williams to keep the money in his estate and give it to a different beneficiary, because this could not be done in the trust. Williams' trust had a clause that the beneficiary could not be changed by one trustor after the death of the other trustor. A beneficiary assignment in an annuity would trump the trust.

Regarding the second annuity application, Pantaleoni testified he called Williams to set up an appointment and Williams agreed. At the appointment, Williams was not sick and did not take off his glasses because his eyes were tearing. They went over why the original application for the annuity was done.

Williams said he cancelled the first annuity because he did not understand it. Pantaleoni talked about why Williams had his assets in a living trust and that a bank account not in the trust would go to probate. They talked about the benefits of the annuity. They talked about the surrender charge and Williams did not say he did not like the surrender provision. Williams asked why he was signing an application again. Pantaleoni explained that NWL required it because there was a change to the income benefit rider to give Williams a better payout in the future.

Pantaleoni handwrote the letter from Williams instructing NWL to reissue the policy because he does this on the spot in front of the client instead of preparing it beforehand. Something might change at the meeting; the client might have some peculiarity or idiosyncrasy regarding the letter of instruction.

16

On redirect, Pantaleoni confirmed that his 2013 agent application gave NWL the right to conduct a background check on him. The bankruptcies Pantaleoni filed were a matter of public record, which NWL could have discovered if they conducted a background check in 2013.

### d. Merrily Lee

Merrily Lee, Williams' stepdaughter, testified that she had never physically or financially abused Williams. In August 2015, Lee returned home when she learned her mother was near death. Lee and Williams took care of administering pain medication to Barbara in the last two weeks of her life. After her mother died, Lee stayed on for another week helping Williams with finding marriage, birth and death certificates and sending death certificates to the appropriate people. To express his appreciation, Williams gave Lee a substantial check.

### e. Ayanna Burns

Ayanna Burns, vice-president of marketing operations at NWL, previously was the manager of the suitability department.

Burns admitted that NWL had not inspected Pantaleoni's records, before or after the April 5, 2017 letter from Williams.

The April 5, 2017 letter came to NWL with a fax cover sheet addressed to the attention of the compliance department. The compliance department has procedures for investigating California complaints. NWL did not investigate the April 5, 2017 letter at the time.

Burns admitted that the August 28, 2017 letter was a complaint letter. Ziebell reviewed the file in responding to the August 28, 2017 letter. The April 5, 2017 letter was in the file. Ziebell would have seen in the file that there had been no investigation of the April 5, 2017 letter.

There was no delivery receipt for the second annuity in NWL's file. NWL believed the policy had been delivered. There was other activity in the file that made it

17

clear Williams was aware of the second annuity. NWL procedure required an e-mail reminding the agent that a signed delivery receipt was needed. There was no such e-mail in the file. Once a policy is issued, there is an automated process for generating a delivery receipt. The second annuity was issued with the same policy number as the first policy, so the automated process for delivery receipt reminders did not occur. If an agent did not provide the signed delivery receipt, a second reminder stated that NWL can charge back the commission. Pantaleoni's commission was never charged back.

Prior to NWL issuing the first annuity to Williams in 2016, NWL was aware from the DOI's website that there was an enforcement action against Pantaleoni and an order restricting his license. There was nothing in NWL's file indicating the company had determined what the enforcement action against Pantaleoni in 2015 involved. His license was still active but restricted. NWL looked into whether Pantaleoni was still eligible to write business with a restricted license.

NWL knew from the first annuity application that Williams was 78 years old. On the suitability questionnaire, a box was checked that Williams' approximate net worth after purchase of the annuity ranged from $50,000 to $99,000 but also stated that he had a liquid net worth of $120,000 after purchase. Burns agreed that this was a mistake. The file did not indicate that NWL called Williams to find out what his net worth was. There was no reason to question his liquid net worth. The discrepancy was not that big. Williams could still be deemed suitable despite this anomaly, based on his other answers on the questionnaire.

Williams' suitability questionnaire stated that his annual income was $24,000. NWL's suitability guidelines state that, if the client's annual income is below $25,000, low income would be a concern if the client does not have adequate liquid assets and emergency savings.

An NWL document setting forth frequently asked questions in a suitability review stated that a person at or nearing age 65 should have liquidity of at least one-and-a-half to

18

two years of expenses liquid in the event of an emergency and an annuity for a person over 65 should make up no more that 60 percent of the client's liquid net worth. Williams had $114,000 of liquidity, so 60 percent of that amount was the largest annuity he should have been sold.

NWL sends a form letter to a client who has decided not to cancel a policy to let the client know the original policy is being conserved. NWL did not send this letter to Williams because a new and different policy was issued that made changes to the original policy.

The fax cover sheet from Starr on April 5, 2017, stated that the letter of instruction and annuity surrender request were provided "to be reviewed by your Compliance department." NWL's California complaint handling procedures required the company to (1) consider all relevant facts in resolving complaints, (2) attempt to resolve oral complaints over the phone and advise clients to make the complaint in writing when it cannot be resolved over the phone, (3) contact the client by phone, e-mail or regular mail to request clarification of any portion of a complaint that is not clearly understood, (4) make notes of communications with the client and agent in the course of the investigation, (5) maintain these records for the time required by statute, and (6) conduct a thorough investigation of the complaint and where an agent denies misconduct take into account whether the agent provided a substantive and believable explanation. NWL did not conduct an investigation in compliance with these procedures. NWL did not treat the April 5, 2017 fax as a complaint.

On cross-examination by NWL, Burns testified that items in the file showed Williams was aware that he had the second annuity policy, including several letters from NWL to Williams, the surrender request, his receipt of a personal identification number (PIN) to access the NWL Web site for information about the policy, and that Williams had accessed the policy online.

19

NWL did not send the letter conserving the policy because the letter only goes out for policies that can be conserved. Williams did not conserve the policy. When NWL received Williams' request during the 30-day free look period, NWL cancelled the first annuity and it was null and void. NWL required a new application and letter of instruction signed by Williams to issue a new policy. The letter of instruction was to make sure he understood why his money was not being returned after he cancelled the first policy.

Burns reviewed the suitability application with a box checked that Williams' net worth after purchase of the annuity ranged from $50,000 to $99,000. NWL measured liquidity as at least one-and-a-half to two years of expenses. $99,000 would be almost five times Williams' expenses. The 60 percent rule was not a strict rule. Another factor that affected the suitability analysis was that the annuity had a withdrawal benefit rider giving Williams an annual income of $7,000 for the rest of his life, which would increase his annual income. Sources of income listed on the suitability questionnaire were 10 percent investments, 80 percent pension, and 10 percent social security—all of which were guaranteed sources of income. It was not uncommon for 78 year olds to have the majority of their income from pension and social security.

On redirect, Burns testified NWL did not require agents in California to submit their business cards for approval. NWL knew that in California an insurance agent has to give a business card to a senior. When Burns reviewed Pantaleoni's file, there was no business card in the file. Burns saw documents in his file referring to Sierra Attorney Services. NWL did not determine what business Sierra Attorney Services was in. NWL did a background check on Pantaleoni when he received his first contract. Burns did not know the exact date of that background check. The background check would have included whether Pantaleoni was in bankruptcy.

Burns saw documents in Pantaleoni's agent file indicating he was affiliated with American Family Legal Services. NWL did not determine the nature of that company's

business because there was no reason to.  There was no document indicating that Pantaleoni worked for American Family Legal Services or that the company had anything to do with the insurance business.

In 2016, NWL did not require agents to have errors and omissions insurance.  It is industry practice now but was not in 2016.

NWL did not terminate Pantaleoni or charge back his commission.  NWL has not refunded the surrender penalty charged to Williams.

### f.    Dr. Aazaz Ul Haq

Dr. Aazaz Ul Haq, an expert witness in forensic geropsychiatry, testified that Williams suffered severe psychological distress as result of his interactions with Pantaleoni and had symptoms of posttraumatic stress disorder.

On cross-examination by NWL, Dr. Haq admitted that his written report did not mention posttraumatic stress disorder.  Dr. Haq agreed that a medical record from Williams' physician at the time of Williams' interaction with Pantaleoni stated under " 'Psychology,' " " 'No depression, no eating disorder, no mental or physical abuse, no anxiety, no stress.' "  Dr. Haq testified that this medical record was not an accurate indication of Williams' mental state and reflected the poor quality of medical records prepared for medical insurance purposes.

### g.    Reynaldo Perez, Jr.

Excerpts of the deposition of Reynaldo Perez, Jr., NWL's chief legal officer, were read to the jury.  Perez testified that NWL did not require agents to submit their business cards for review and approval.

Perez confirmed that Ziebell was involved in handling policy holder complaints in 2016 and 2017.  The April 5, 2017 letter sounded as if it was a complaint about the agent's conduct.  If the complaint handling department or whoever received the April 5, 2017 letter thought it was a complaint, they should have followed the requirements of NWL's complaint handling procedures.

Perez stated that NWL did not contract with legal service companies. All NWL contracts were with independent insurance agents, not with legal service providers. NWL had compliance bulletins advising agents to avoid arrangements with legal service providers. NWL did not have a policy or procedure (1) that applied when the company learns that a legal service company is a trust mill, or (2) that screened legal service companies to make sure they are not trust mills. NWL did not take steps to make sure that the company is not doing business with agents selling annuities with trust mills other than to communicate the prohibition to agents.

If an agent violated a compliance bulletin or engaged in unlawful conduct, NWL had the right to terminate the agent. NWL did not terminate Pantaleoni.

### h.     Neal Bordenave

Neal Bordenave, an expert witness on the standard of care in life insurance transactions with elders in California, testified that NWL had guidelines and requirements in compliance bulletins but did not enforce them and had no checks and balances to make sure annuities were being transacted correctly. All insurance companies send out bulletins and expect agents to review them, but marketing or compliance people at insurance companies need to confirm that agents are in compliance with bulletins.

The document Williams wrote returning the first annuity was from someone with marginal literacy, which should have voided the annuity, but NWL asked Pantaleoni to conserve the annuity and a week later NWL issued another $100,000 annuity with the same policy number. The suitability questionnaire did not reconcile, which should have been a red flag for NWL to investigate further. The annuity of $100,000 was 85 to almost 90 percent of Williams' liquid assets, which did not meet a reasonable suitability standard. The April 5, 2017 letter from Starr was effectively a complaint about Pantaleoni indicating a need to investigate the incompleteness of the file and NWL should have immediately offered to pay Williams' money back.

22

Bordenave disagreed with NWL's expert, Larry Nevonen, that Pantaleoni was a broker, stating that in California to transact life insurance or annuities Pantaleoni had to be an agent of NWL.[8]

On cross-examination by NWL, Bordenave confirmed that he was testifying that NWL's overall supervision of Pantaleoni was insufficient. Bordenave stated that insurance companies have a responsibility to monitor their agents to make sure they are doing the right thing. Failing to monitor agents falls below reasonable custom and practice in the insurance industry. Insurance companies need to monitor agents because they are the company's agents.

Bordenave agreed that there was nothing in NWL's file to put the company on notice that Williams was complaining that he wanted a trust but got an annuity.

### 2. NWL's Case

#### a. Larry Nevonen

Nevonen, an insurance industry expert, testified that the name Sierra Attorney Services in the agent's file did not give rise to duty to inquire what the name meant. The name was authorized by the Nevada Department of Insurance. Sierra Attorney Services received an assignment of commissions but never transacted insurance in California under that name. A legal name in Nevada would not be a red flag for illegal activity in another state.

The card Pantaleoni gave Williams improperly mixed insurance business with living trust and paralegal services business. The card should not have had a CSA

---

[8] Bordenave also testified that Pantaleoni breached the standard of care: (1) he offered to do trust work as a way to sell insurance in violation of the Insurance Code; (2) he had Williams sign a blank check; (3) Williams apparently did not know he was buying an annuity; (4) Pantaleoni was illegally charging fees for trust work and getting a commission on an insurance transaction at the same time; (5) Pantaleoni may not have delivered the second annuity to Williams; and (6) Pantaleoni did not provide the required 24-hour notice acknowledged by the customer for sales to a person over 65.

designation that was expired and not recognized in California. Nothing on the card referred to NWL that would trigger review by NWL.

NWL's compliance manuals were consistent with industry practice. Pantaleoni's conduct did not constitute a trust mill because it was not a repetitive practice. "The classic trust mill situation is senior seminars for trust services and everybody walks out with an annuity." Pantaleoni met with Williams not to sell an annuity but on learning his situation thought he might benefit from an annuity.

Nevonen was not surprised that the NWL annuity had a 13-year surrender period. Actuaries require higher surrender charges in the early years of an annuity because of the financial risk to the insurance company that comes from early surrenders.

In doing a suitability review, NWL did not see Pantaleoni's bad acts. NWL assumed the suitability questionnaire was accurate. The contractual responsibility of the agent was to ask questions of the applicant and accurately record the answers in the application. For a senior, the particular focus is on liquid assets available after purchase of the annuity, so that if there is a change in the annuitant's expenses the annuity does not have to be surrendered. The application answered this question by stating Williams had $120,000 in liquid assets. There were inconsistences in the questionnaire but it did not have to be entirely consistent. The questionnaire need only show a reasonable basis to determine there to be enough liquidity to avoid early surrender from a change of circumstances.

In forming his suitability opinion, Nevonen considered the product sold. NWL's guaranteed benefit withdrawal rider had a good reputation in the industry for being liberal and favorable to buyers, which made it a good choice for people who want to improve their income and still have surrender value. The second NWL annuity sold to Williams had a guaranteed withdrawal benefit rider that would generate $7,200 annual income and also allowed him to withdraw 50 percent in 10 percent increments over time. This was a more liberal benefit than the first annuity.

24

Nevonen disagreed with Bordenave's opinion that NWL was required to supply and obtain a copy of the 24-hour notice. The notice was the agent's responsibility. The agent does the meeting and is required to keep a copy of the notice for seven years, even where no sale results. The custom and practice was for insurance companies to make agents aware of the requirement.

There is no requirement that an insurance company's name be on an agent's card presented to a senior. An agent might be offering several companies' products.

The letter cancelling the first annuity voided the policy. It is fairly common for people to change their minds about a policy. The change from the first annuity to the second annuity made objective sense since the withdrawal benefit rider increased the payout. The $100,000 should have been sent back promptly unless there was a written direction from the buyer that he wanted a different policy. The notice to Pantaleoni that he had five days to conserve the business was not just to conserve the business but was also a heads up to check in with the client. Often a different agent will offer a customer an annuity during the 30-day free look period, describing it as a better deal. The first agent will not know what has happened, and the insurance company only will know the annuity was surrendered.

Nevonen disagreed with negative comments about the handwritten letter instructing NWL to keep the policy. Agents meeting with people do not have computers. A handwritten note is more likely to be performed with the knowledge and consent of the applicant than a typed letter. The fact that the note was handwritten was a positive indication that it represented Williams' actual decision.

The April 5, 2017 letter from Starr was a mixed and unclear request for service to process surrender of the policy combined with complaint language. Nevonen was not surprised the letter went to the service department instead of the compliance department because the letter opened and closed with a request for service. Williams did not put NWL on notice of a problem that needed to be addressed. Williams did not complain at

the time about Pantaleoni's selling practices because he liked the interest in the annuity. Starr handled the surrender properly but mishandled the complaint.

The Ziebell letter was responsive to the demand letter from Cole based on her reading of the file. There was no documentation that Williams was demanding an investigation of Pantaleoni or return of surrender charges.

### b.     Juanita Ziebell

Beginning in March 2015, Ziebell was in the compliance department at NWL.

The August 28, 2017 letter from Cole and Williams was a request for copies of documents. Ziebell had received a request for documents but did not have a specific complaint, so she was generally looking at the file. Since the April 5, 2017 letter was also in the file, in Ziebell's opinion the August 28, 2017 letter was a complaint. Ziebell testified that it sometimes happens that an initial expression of dissatisfaction is followed by a letter from an attorney.

In handling the complaint in 2017, Ziebell reviewed the initial annuity application. All of the documents in the file appeared to be properly signed. The signature was distinctive. The check was in the file. It did not look suspicious or forged. It did not occur to Ziebell that the check might be filled out after it was signed. Ziebell went by the signature on the first application and from that point was looking for consistencies or inconsistencies in signatures.

The April 5, 2017 letter in the file contained complaint language. Ziebell did not form the impression from the letter that the policy holder did not know they owned the policy at the time the letter was written. The letter requested surrender of the annuity and NWL did that for Williams. Ziebell did not believe the agent had successfully interfered with the initial cancellation because Williams cancelled the policy himself. Both the initial cancellation and surrender of the second policy were effectuated successfully. Ziebell believed Williams had requested the second policy and wanted to surrender it because the policy had been in force for a year.

26

Ziebell provided some narrative in her letter response because, when an annuity has been surrendered, it was her standard practice to point out the benefits of the annuity. Ziebell sent the requested documents by Federal Express.

Ziebell testified that mostly NWL receives a letter stating a specific complaint. Ziebell responded to the August 28, 2017 letter with some narrative instead of just sending the requested documents, because NWL tries to explain the benefits of the annuity to the client, which sometimes helps the client to reply. NWL sets the matter for a follow-up in the system if there is a reply to get more information. The system has a 30-day review set up automatically. Ziebell will look at the file to see if there is a response from the client and then NWL gives it another 30 days. That would have happened twice after Ziebell wrote her letter.

This file was unusual because most of the time she would get a reply with more details about the grievance. Ziebell was hoping for a reply explaining the nature of the grievance. Ziebell's letter gave a telephone number to contact Ziebell or the NWL client services department with any further questions. More often than not the client will call the number. Ziebell was not trying to resolve the entire complaint process with her letter, but rather to make a record of what she saw in the file so Williams could address it.

In reviewing the file, Ziebell saw there was a blank delivery receipt. It did not cross her mind that Williams did not receive the policy, because he had surrendered it. Applicants also received a welcome letter with an offer for a PIN and an interest letter on the anniversary of the policy.

On cross-examination by Pantaleoni, Ziebell testified she retained the April 5, 2017 letter from Starr in the file, but did not reach out to Williams to address it because the annuity had already been surrendered.

On cross-examination by Williams, Ziebell confirmed that she was following the specific procedures for complaints from California in April 2017 and would do an investigation in response to a complaint. She admitted that the compliance department

27

did not review the April 5, 2017 letter at the time or contact Williams to request documentation. The April 5, 2017 letter did not go to the compliance department but to the surrender department. Surrender was a priority.

### c.    Diamantina Courson

Diamantina Courson, currently the highest ranking person in licensing at NWL, testified to the basic functions and procedures of the licensing department. NWL operates in 49 states and Puerto Rico, Guam and the Virgin Islands. NWL has about 20,000 agents.

On cross-examination by Williams, Courson testified that the legal department makes the decision to terminate an agent for misconduct or unlawful conduct. Licensing staff are not trained to look for agent complaints. If there is a complaint, it goes to the complaint department. Licensing would want to know if an agent was in trouble or had done something unlawful, but would not get the information unless it was sent to licensing. A report goes to licensing where information is received by compliance.

Courson testified that NWL procedure is to do a background check when newly contracting with the agent. The background check would not include looking for a bankruptcy. NWL would have run a background check on Pantaleoni when he was first appointed in 2005. NWL did not run a background check on Pantaleoni at the time of his new contract in 2013.

In January 2016, when NWL learned that Pantaleoni had been the subject of enforcement action and had been placed on a restricted license, NWL would go to DOI to check to see if the license was active and what the enforcement notice concerned. DOI would tell NWL if the enforcement action had been resolved. DOI would give background information from the enforcement documents only if NWL asked for it. Courson did know if NWL had asked for this information.

#### d.     Ayanna Burns

On defense for NWL, Burns testified that she reviewed the annuity transaction with Williams for conformity with company policies and standards of suitability and it appeared to be suitable based on the documents the company received. There were no signs that Williams' signature was forged or other red flags as to suitability. The answers provided in the suitability questionnaire and other documents looked in line for Williams' age, what he was looking for, and the additional benefits he was receiving.

On cross-examination by Williams, Burns confirmed that NWL uses a score sheet to document and determine suitability. A score equal to or greater than 10 would require documentation by the suitability reviewer as to why the product is still deemed suitable. NWL did not have the score sheet for Williams because it was changing systems and the results were loaded into the new system. There was no need to keep the actual score sheet.

On redirect, Burns testified that the total suitability score for Williams was 6.2. NWL's suitability reviewer or a coder entered information from the suitability questionnaire into an Excel spreadsheet, which generated a score and the information was uploaded into NWL's system. The suitability reviewer looked at the information, the suitability questionnaire, and other documents to make sure the reviewer felt the product was suitable, and entered comments in the system. In user notes, the reviewer, Jennifer Burgess, identified a yellow flag for annual income because it was below $25,000. The reviewer noted that Williams' expenses were covered and he had more than five years of liquidity. It looked like Williams had plenty of liquidity based on the information provided.

### C.     Motion for Nonsuit

At the close of Williams' evidence, NWL filed a motion for nonsuit. The court denied the motion finding that "there has been substantial evidence presented during plaintiff's case in chief supporting judgment on all causes of action for the plaintiff."

29

**D.  Jury Verdicts and Judgment**

The jury found NWL liable for elder abuse awarding Williams $14,949.41 in damages for economic loss, $200,000 in noneconomic damages for past pain and suffering, and $150,000 for future pain and suffering, totaling $364,949.41.  The jury further determined the Williams had proved by clear and convincing evidence that NWL acted with recklessness, malice, oppression or fraud.

The jury also found Pantaleoni liable for elder abuse and that Williams proved Pantaleoni acted with recklessness, malice, oppression or fraud, awarding total money damages of $168,309.41 on this claim.

The jury found both NWL and Pantaleoni liable for negligence, awarding Williams total money damages of $618,309.41 and allocating 30 percent to Pantaleoni and 70 percent to NWL.  The jury further found Pantaleoni liable for intentional misrepresentation and awarded $200,000 in total damages.

The jury awarded punitive damages of $1,000 against Pantaleoni and $2.5 million against NWL.[9]

In entering judgment, the trial court found that noneconomic damages awarded in the verdict for negligence overlapped with the elder abuse award.  To avoid double recovery, the court limited noneconomic damages to $600,000 allocating 70 percent ($420,000) to NWL and 30 percent ($180,000) to Pantaleoni.

The court entered judgment for Williams in the amount of (1) $14,949.41 against Pantaleoni and NWL, jointly and severally, (2) $2.92 million against NWL, and (3) $186,050.59 against Pantaleoni.

---

[9]     Regarding punitive damages, the parties stipulated that NWL had $1.4 billion in assets and Pantaleoni was able to pay $1,000 in punitive damages.

**E.  Posttrial Proceedings**

NWL filed motions for judgment notwithstanding the verdict and for a new trial, arguing, inter alia, that Pantaleoni was not NWL's agent in the transactions with Williams.

The trial court denied the motions.

## II.  DISCUSSION

**A.  Section 1704.5**

It is undisputed that NWL issued two annuities, a form of life insurance policy, to Williams on applications submitted by Pantaleoni.  Thus, under section 1704.5, Pantaleoni was NWL's authorized agent and NWL was "responsible for all actions of the agent that relate to the application and policy as if the agent had been duly appointed for the insurer."  (§ 1704.5, subd. (a).)

In its petition for rehearing, NWL argues the reference to section 1704.5 in our prior opinion was a "mistake of law," because the provision only applies to life agents not specifically appointed by an insurer, Pantaleoni was appointed by NWL, and therefore section 1704.5 does not apply.  However, section 1704.5 is relevant because it reinforces the principle that life insurance is treated differently from other forms of insurance, such that a life insurer is always responsible for the actions of a life agent that procures a life insurance policy or annuity, regardless of whether the insurer formally appointed the agent or whether the agent, like Pantaleoni, represents multiple insurers.

Pantaleoni's actions included:  (1) misrepresenting on NWL's suitability questionnaire that Williams' annual income was $24,000 when Williams told Pantaleoni it was $16,000; and (2) misrepresenting on the questionnaire that Williams' net worth after purchasing the annuity was $50,000 to $99,999 and liquid net worth was $120,000, when Williams had approximately $80,000 invested with a broker but only $114,000 in the bank and Pantaleoni had facilitated Williams' signing a check for $100,000 drawn on his bank funds to purchase the annuity.

Pantaleoni was NWL's agent and NWL was responsible for his wrongful actions committed in the sales of NWL annuities to Williams. (See *People ex rel. Bill Lockyer v. Fremont Life Ins. Co.* (2002) 104 Cal.App.4th 508, 525-526 (*Lockyer*); Civ. Code, § 2338 ["a principal is responsible to third persons for the negligence of his agent in the transaction of the business of the agency, including wrongful acts committed by such agent in and as a part of the transaction of such business . . . "].) As NWL's agent, Pantaleoni's knowledge regarding the annuity sales to Williams was imputed to NWL whether or not Pantaleoni conveyed that information to NWL. (See *O'Riordan v. Federal Kemper Life Assurance Co., supra*, 36 Cal.4th at p. 288 (*O'Riordan*); Civ. Code, § 2332 ["As against a principal, both principal and agent are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other"].) Such imputed knowledge included that Williams' annual income was not $24,000 as stated on the first suitability questionnaire but $16,000, and he did not have $120,000 of liquidity after he gave Pantaleoni a check for $100,000 to buy the annuity. In short, NWL was charged with knowledge that the annuity was not suitable for Williams.

In supplemental briefing, NWL preliminarily argues that the California Supreme Court only directed this court to eliminate the portion of our prior opinion analogizing an independent agent serving multiple insurance companies to an insurance broker. NWL maintains that an insurance agent selling policies for multiple insurers may be the agent of the insurance company or the insured, depending on the facts. (See *Eddy v. Sharp* (1988) 199 Cal.App.3d 858, 865 (*Eddy*) ["If an insurance agent is the agent for several companies and selects the company with which to place the insurance or insures with one of them according to directions, the insurance agent is the agent of the insured"]; *Mercury Ins. Co. v. Pearson* (2008) 169 Cal.App.4th 1064, 1073 (*Mercury*) [same, citing *Eddy*]; see also *Loehr v. Great Republic Ins. Co.* (1990) 226 Cal.App.3d 727, 733 (*Loehr*) ["An agent is generally not limited in the number of agency appointments that he or she

32

may have; thus, an agent may solicit business on behalf of a variety of different carriers, and still technically be an agent of each of those carriers"].)

NWL misses the point of section 1704.5, which treats an agent selling life insurance differently from agents selling other classes of insurance. *Eddy* and *Mercury* did not involve life insurance. (*Eddy, supra*, 199 Cal.App.3d at p. 862 [property insurance]; *Mercury, supra*, 169 Cal.App.4th at pp. 1066-1067 [automobile insurance]; see also *Loehr, supra*, 226 Cal.App.3d at p. 729 [health insurance]; cf. *Lockyer, supra*, 104 Cal.App.4th at p. 511 [annuities]; *O'Riordan, supra*, 36 Cal.4th at p. 283 [life insurance].) Under section 1704.5, by operation of law, an agent submitting an application for a life insurance or an annuity policy, which is then issued by an insurer, is the insurer's authorized agent and the insurer is responsible for the agent's actions. The California Supreme Court emphasized this statutory distinction in its order to this court by highlighting that the definition of an insurance "agent" and "broker" set forth in sections 32 and 33, respectively, expressly exclude life insurance.

NWL's principal contention is that "the undisputed facts show that Pantaleoni was acting outside the scope of his agency for NWL when he sold an annuity to Williams, and therefore NWL cannot be held liable for Pantaleoni's negligent conduct." NWL argues Pantaleoni's agreement with NWL "expressly prohibited the sales tactics Pantaleoni employed with Williams." Pantaleoni also failed to follow "the advice of NWL's many compliance bulletins" he received relating to California laws and regulations. NWL cites evidence presented at trial that "Pantaleoni violated California law, violated Pantaleoni's contract with NWL, or both, when he (1) did not inform Williams prior to either of his trust meetings that the purpose of the interaction was to sell insurance; (2) did not present the NWL annuity completely and accurately while leaving the brochures and disclosures with Williams; (3) misled Williams into believing that he was receiving trust work and not an NWL annuity; (4) identified himself as a paralegal but would not say if an attorney supervised his work; (5) claimed to be a CSA but his certification lapsed in 2008; (6)

33

mixed his trust services with the sale of NWL's annuity; and, (7) gave Williams legal advice relating to changing his trust's beneficiary without a license."

Missing from this list are the critical facts that Pantaleoni filled out the suitability questionnaires for Williams that overstated his annual income and grossly overstated his net worth and liquid net worth after purchasing the annuity. Under section 1704.5, NWL is responsible for these actions and charged with Pantaleoni's knowledge that these figures were false and that the true state of affairs was that the annuities were unsuitable for Williams. Thus, NWL is responsible for its agent's actions in procuring an unsuitable annuity.

Moreover, assuming Pantaleoni exceeded his authority in some or any of his actions, there is no evidence that Williams knew or had notice that Pantaleoni had breached his contract with NWL or failed to follow NWL's compliance bulletins. Absent notice to the insured, an insurer is liable for the acts of an agent that are within the ordinary scope and limits of the insurance business entrusted to the agent, even if they are in violation of private instructions and restrictions on the agent's authority. (See *Chicago Title Ins. Co. v. AMZ Ins. Services, Inc.* (2010) 188 Cal.App.4th 401, 426; *R & B Auto Center, Inc. v. Farmers Group, Inc.* (2006) 140 Cal.App.4th 327, 344; *Troost v. Estate of DeBoer* (1984) 155 Cal.App.3d 289, 298; *Lange v. Curtin* (1936) 11 Cal.App.2d 161, 169 ["As a general rule the principal is bound by the unauthorized acts of his agent through which an innocent third party has sustained loss unless the limitations of the agency are known or can be readily ascertained"].) NWL appointed Pantaleoni to procure applications and deliver insurance policies, which was what he did in Williams' case. The actions that NWL asserts breached Pantaleoni's contract with NWL and violated the company's compliance bulletins occurred in the course and scope of Pantaleoni procuring annuity applications from Williams and delivering policies to him that NWL issued. Since NWL does not direct us to evidence in the record showing that Williams knew the terms of NWL's agreement with Pantaleoni, the advisements of NWL's compliance

34

bulletins, or Pantaleoni's violations thereof, NWL cannot insulate itself from liability by claiming that they were outside the scope of his authority.

NWL's supplemental brief does not address the jury verdict on Williams' elder abuse claim, but Insurance Code section 1704.5 affects that claim, as well. Financial elder abuse "occurs when a person or entity . . . [¶] (1) Takes, secretes, appropriates, obtains, or retains real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both." (Welf. & Inst. Code, § 15610.30, subd. (a)(1).) The statute defines "wrongful use" as taking property of an elder by a person or entity who "knew or should have known that this conduct is likely to be harmful to the elder or dependent adult." (Welf. & Inst. Code, § 15610.30, subd. (b); *Paslay v. State Farm General Ins. Co.* (2016) 248 Cal.App.4th 639, 657.) Since, under Insurance Code section 1704.5, NWL is charged with knowledge of what Pantaleoni knew—i.e., that Pantaleoni employed deceptive methods to sell Williams unsuitable annuities—NWL committed financial elder abuse in accepting $100,000 from Williams to purchase the annuity and in charging him a $14,949.91 surrender penalty.

In our prior opinion, because we reversed the judgment in favor of Williams, we found moot the remaining issues that NWL raised on appeal and that Williams raised in his cross-appeal concerning the attorney fee award. Since we now affirm the judgment against NWL on Williams' negligence and financial elder abuse claims, we turn to the remaining issues.

B.     **Emotional Distress Damages**

NWL challenges the jury's award and the trial court's allocation of $420,000 in noneconomic damages to NWL on various grounds. NWL contends: (1) Williams presented no evidence that NWL caused him emotional distress; (2) emotional distress damages are "inappropriate" under the economic loss rule; (3) the large amount of emotional distress damages raised a presumption that the award against NWL was the

35

product of passion and prejudice; and (4) the allocation of 70 percent of emotional distress damages was not supported by substantial evidence.[10]

NWL's first contention is essentially that there is no substantial evidence to support an award of emotional distress damages against the company. (*Garcia v. Myllyla* (2019) 40 Cal.App.5th 990, 999 ["We review the evidence relating to emotional distress damages under the substantial evidence standard"].) Under the substantial evidence standard, "we ' "view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor." ' [Citation.] Our task '*begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted,' which will support the verdict. [Citation.] Substantial evidence is any evidence that is ' "reasonable in nature, credible, and of solid value." ' [Citation.]" (*Id.* at pp. 999-1000.)

NWL admits that Dr. Haq testified that Williams suffered severe emotional distress. Dr. Haq testified Williams was traumatized by the loss of control of his life savings that he had accumulated over many years with his wife, which became an "ongoing trauma, and a lot of his symptoms can best be thought of as a posttraumatic stress disorder." (See *Kelly-Zurian v. Wohl Shoe Co.* (1994) 22 Cal.App.4th 397, 410 [plaintiff's posttraumatic stress disorder diagnosis and symptoms constituted substantial evidence supporting emotional distress damages].) To the extent NWL attempts to attribute Williams' emotional distress to Pantaleoni alone, under section 1704.5, NWL is

---

**10**     NWL also claims that the trial court erroneously denied its motion in limine to exclude evidence of emotional distress and "doubled down" on the error by instructing the jury that Williams had a preexisting disability that NWL aggravated and that Williams had impaired faculties, which instructions NWL asserts misled the jury and impacted the verdict. NWL does not cite supporting authority or articulate a standard for evaluating these claims, which are not set forth under a separate heading. Accordingly, we do not consider them. (See *Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 279 (*Hernandez*).)

liable for his negligent actions that led to Williams' emotional distress. (See also *Jacoves v. United Merchandising Corp.* (1992) 9 Cal.App.4th 88, 103-104 [denying summary judgment to hospital on negligent infliction of emotional distress claim because triable issues existed as to whether negligent doctor was hospital's agent].)

Turning to the economic loss rule, NWL does not cite any authority applying the rule to damages awarded on a financial elder abuse claim. In *American General Life Insurance Co. v. Valentine* (C.D.Cal. April 13, 2017, No. LA CV16-08097 JAK (JCx)), 2017 WL 5635014, the federal court rejected application of the economic loss rule in that context. The court explained: " 'The economic loss rule requires a purchaser to recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise.' [Citation.] The rationale behind the rule is that it 'prevent[s] the law of contract and the law of tort from dissolving one into the other.' [Citations.] The elder abuse claim arises under statute and not the common law of torts. Thus, California Welfare and Institutions Code § 15657.5 provides for 'compensatory damages and all other remedies otherwise provided by law,' as well as 'reasonable attorney's fees and costs.' " (*Id.* at p. *11.)[11]

Regarding the amount of the emotional distress damages awarded, "[w]hen an appellate court reviews a jury verdict for excessive damages, it can interfere 'only on the ground that the verdict is so large that, at first blush, it shocks the conscience and suggests passion, prejudice or corruption on the part of the jury.' [Citation.]" (*Pearl v. City of Los Angeles* (2019) 36 Cal.App.5th 475, 491, quoting *Seffert v. Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 507.) While the emotional distress damages awarded

---

**11** NWL does not distinguish between negligence and financial elder abuse regarding application of the economic loss rule. We are not obliged to develop NWL's arguments for it. (*Hernandez, supra*, 37 Cal.App.5th at p. 277.) In any event, the trial court determined that damages awarded for emotional distress on Williams' financial elder abuse and negligence claims overlapped.

against NWL were high, we cannot say that an award of $420,000 "shocks the conscience," even though Williams' economic damages were relatively small, amounting to $14,949.91. (See *Iwekaogwu v. City of Los Angeles* (1999) 75 Cal.App.4th 803, 821 [$450,000 for emotional distress out of $500,000 total damages awarded were not "excessive as a matter of law"]; *Little v. Stuyvesant Life Ins. Co.* (1977) 67 Cal.App.3d 451, 465-466 [award of $172,325 for emotional distress where no economic loss was proved was not "so excessive or disproportionate as to raise a presumption that it resulted from passion or prejudice"].)

NWL presents a cursory argument that "there is no justification for holding NWL 70% responsible for Williams' emotional distress where no evidence supported that NWL caused any of Williams' non-economic damages." "We review a jury's apportionment of fault under the substantial evidence standard and will disturb the finding only if unsupported by the evidence." (*Scott v. County of Los Angeles* (1994) 27 Cal.App.4th 125, 147; *Pfeifer v. John Crane, Inc.* (2013) 220 Cal.App.4th 1270, 1286 ["courts rarely disturb the jury's apportionment of fault"].)

Here, there was substantial evidence supporting allocation of 70 percent of noneconomic damages to NWL. Among other things, NWL did not immediately return Williams' $100,000 premium payment when he sent back the first annuity during the free look period with a note that he did not want it. Rather, NWL advised Pantaleoni to contact Williams to induce him to keep the annuity, applied the payment on the first annuity to the second annuity, and assessed a surrender charge when Williams sought to return the second annuity. Had these actions by NWL not occurred, Williams would not have unwittingly purchased a second annuity policy, when he never wanted the first one, and incurred a loss of thousands of dollars when he returned that annuity, which as Dr. Haq testified, was the main source of the traumatic psychological effects Williams experienced. Accordingly, we have no basis to disturb the allocation of fault.

38

## C. Punitive Damages

NWL contends that punitive damages could not be imposed because the evidence merely showed negligence and there was no evidence that a managing agent knew of or ratified Pantaleoni's conduct. Alternatively, NWL argues that the amount of $2.5 million imposed was unconstitutionally excessive. We agree with NWL on the first point and therefore do not address the second.

To award punitive damages, it must be "proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice . . . ." (Civ. Code, § 3294, subd. (a).) In addition, to recover punitive damages for financial elder abuse against a corporate defendant, a plaintiff must satisfy the requirements of Civil Code section 3294, subdivision (b). Subdivision (c) of Welfare and Institutions Code section 15657.5 provides in relevant part: "The standards set forth in subdivision (b) of Section 3294 of the Civil Code regarding the imposition of punitive damages on an employer based upon the acts of an employee shall be satisfied before any punitive damages may be imposed against an employer found liable for financial abuse as defined in Section 15610.30." Civil Code section 3294, subdivision (b) states: "An employer shall not be liable for damages pursuant to subdivision (a), based upon acts of an employee of the employer, unless the employer had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice. With respect to a corporate employer, the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation."

"Our review is for sufficiency of the evidence to support the jury's decision to award punitive damages. [Citation.] '[W]hen presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing

evidence, [we] must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof.' [Citation.] The clear and convincing evidence standard of proof ' "requires a finding of high probability" ' that the fact is true." (*Morgan v. J-M Manufacturing Co., Inc.* (2021) 60 Cal.App.5th 1078, 1089-1090 (*Morgan*), quoting *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 998, 1005 (*O.B.*).)

Williams asserts that: "NWL's status as Pantaleoni's principal provides even more substantial evidence supporting the jury's punitive damage [*sic*] award. This is because NWL's status imputes to it, as a matter of law, all of Pantaleoni's knowledge and ratification of his fraudulent and other misconduct in connection, with two annuity applications. NWL 'is deemed to have knowledge of such facts,' " quoting *O'Riordan, supra*, 36 Cal.4th at page 288. However, even if we impute knowledge of Pantaleoni's acts to NWL based on a principal-agent relationship under Insurance Code section 1704.5, recovery of punitive damages for financial elder abuse requires more. Civil Code section 3294, subdivision (b), incorporated in Welfare and Institutions Code section 15657.5, subdivision (c), calls for a plaintiff to show by clear and convincing evidence that an officer, director or managing agent had the required advance knowledge and conscious disregard, authorized or ratified the agent's acts, or personally acted with oppression, fraud or malice towards the plaintiff. (Civ. Code, § 3294, subd. (b); see also *Barton v. Alexander Hamilton Life Ins. Co. of America* (2003) 110 Cal.App.4th 1640, 1644; *White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 571 (*White*) [Civ. Code, § 3294, subd. (b) was intended by the Legislature "to avoid imposing punitive damages on employers who were merely negligent or reckless and to distinguish ordinary respondeat superior liability from corporate liability for punitive damages"].)

As to advance knowledge, Williams argues "NWL acquired advance knowledge of Pantaleoni's use of misleading business names to sell insurance and then continued to

40

employ him without taking action reasonably designed to protect the rights or safety of others." Williams also refers to NWL's "knowledge of [Pantaleoni's] restricted license."

However, evidence of advance knowledge of the employee's unfitness must show that a director, officer or managing agent of the corporate defendant knew that the agent or employee had a propensity to inflict the injury that the plaintiff sustained. (See *Weeks v. Baker & McKenzie* (1998) 63 Cal.App.4th 1128, 1159; Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2021) ¶ 13:402.5 ["It must appear that the employer had advance knowledge of the employee's *propensity to perform the type of act* committed against the plaintiff"].) Conscious disregard also requires " ' "*actual knowledge* of the risk of harm it is creating, and in the face of that knowledge, fail[ure] to take steps that [the defendant] knows will reduce or eliminate the risk of harm." ' " (*King v. U.S. Bank National Assn.* (2020) 53 Cal.App.5th 675, 711, quoting *Butte Fire Cases* (2018) 24 Cal.App.5th 1150, 1159.)

At best, the evidence presented showed that NWL was negligent in appointing Pantaleoni and renewing his appointment to sell annuities (e.g., in light of his restricted license). However, there was no evidence that any person at NWL, let alone a director, officer or managing agent, knew in advance of Pantaleoni's propensity to commit the misconduct that victimized Williams.

Turning to ratification, Williams contends that Perez, Burns, Ziebell and Mohr were NWL's managing agents. NWL disputes that Ziebell and Mohr were managing agents but concedes that Perez and Burns qualify for that status. However, NWL maintains that neither Perez nor Burns had actual knowledge of Pantaleoni's misconduct prior to Williams' suit.

There is insufficient evidence in the record from which a reasonable fact finder could have found it highly probable that Ziebell and Mohr were NWL's managing agents. (*O.B., supra*, 9 Cal.5th at p. 1011.) The evidence Williams describes as supporting that determination showed only that they had discretion in handling individual customer

41

complaints and compliance issues. This is not the discretionary authority described in *White*, where the California Supreme Court said, "principal liability for punitive damages [does] not depend on employees' managerial level, but on the extent to which they exercise substantial discretionary authority over decisions that ultimately determine corporate policy." (*White, supra*, 21 Cal.4th at pp. 577-578; *Cruz v. HomeBase* (2000) 83 Cal.App.4th 160, 167-168 (*Cruz*) [" '[C]orporate policy' is the general principles which guide a corporation, or rules intended to be followed consistently over time in corporate operations. A 'managing agent' is one with substantial authority over decisions that set these general principles and rules"].) There was no evidence that Ziebell and Mohr had discretionary authority that determined general NWL policy.

Williams analogizes Ziebell and Mohr to the claims adjuster in *Major v. Western Home Ins. Co.* (2009) 169 Cal.App.4th 1197, held to be a managing agent for purposes of ratification. This case hurts Williams' argument more than it helps. In *Major*, the claims adjuster was the "regional manager/supervisor/claims adjuster," who "managed 35 employees in an office in Minnesota that handled claims as far away as California, oversaw the claims operation, supervised lower ranking supervisors, trained adjusters, worked on the budget, supervised the handling of certain files, and authorized payment of benefits." (*Id.* at p. 1220.)

Assuming based on NWL's concession that Perez and Burns were managing agents for purposes of Civil Code section 3294, subdivision (b), the record does not contain evidence based on which a reasonable fact finder would find it highly probable that Perez or Burns had the requisite knowledge and acceptance of Pantaleoni's conduct for Williams to recover punitive damages against NWL under a ratification theory. "For purposes of determining an employer's liability for punitive damages, ratification generally occurs where, under the particular circumstances, the employer demonstrates an intent to adopt or approve oppressive, fraudulent, or malicious behavior by an employee in the performance of his job duties." (*College Hospital Inc. v. Superior Court* (1994)

42

8 Cal.4th 704, 726 (*College Hospital*); see also *Cruz, supra*, 83 Cal.App.4th at p. 168 [" '[R]atification' is the 'confirmation and acceptance of a previous act' "].) "Corporate ratification in the punitive damages context requires actual knowledge of the conduct and its outrageous nature." (*College Hospital, supra*, at p. 726; *Cruz, supra*, at p. 168 ["A corporation cannot confirm and accept that which it does not actually know about"].) Thus, recovery of punitive damages from a corporation based on ratification requires clear and convincing evidence that a director, officer or managing agent had actual knowledge of an agent's malicious and outrageous conduct and adopted or approved such conduct.

Williams claims that Perez ratified Pantaleoni's misconduct because he learned of it from Williams' complaint, but NWL failed to investigate the allegations of the complaint, did not return the surrender charge, and did not terminate Pantaleoni. As for Burns, Williams asserts that she knew of the suitability requirements that Williams could not meet, and when designated as NWL's most qualified person in this case, reviewed the agent file for Pantaleoni and the annuity file for Williams, learning that Williams' complaint had not been investigated, there was no delivery receipt for the second annuity, and NWL did not charge back Pantaleoni's commission. NWL also claims that Burns reviewed Williams' complaint but NWL did not terminate Pantaleoni, investigate the complaint, charge back Pantaleoni's commission, or refund the surrender charge.

None of this evidence shows actual knowledge on the part of Perez or Burns of Pantaleoni's malicious and outrageous misconduct until Williams filed suit. In *College Hospital*, the California Supreme Court said the ratification issue "commonly arises where the employer or its managing agent is charged with failing to intercede in a known pattern of workplace abuse, or failing to investigate or discipline the errant employee once such misconduct became known." (*College Hospital, supra*, 8 Cal.4th at p. 726.) None of the cases cited in *College Hospital* involved a managing agent of the corporation

learning for the first time of the misconduct of the agent or employee via the allegations of a lawsuit. (*Ibid.*)

To be sure, in *Chodos v. Insurance Co. of North America* (1981) 126 Cal.App.3d 86, in response to receiving the insured's lawsuit, there was evidence of the insurance company's decision not to pay the plaintiff, including an internal memorandum which characterized the insurer's position as " 'very strong.' " (*Id.* at p. 102.) The court said that the insurer's "choice to respond to the summons and complaint rather than settle the matter removes any doubt about 'ratification' of the procedure utilized by the [insurer's] employees." (*Id.* at p. 103.)

There was no similar evidence in this case. To the contrary, Williams moved to exclude, and NWL moved to admit, evidence of settlement negotiations, including NWL's multiple offers to compromise that included compensation for the surrender charge. The court ruled in favor of Williams on the dueling motions. NWL agrees on appeal that the trial court's ruling was correct. However, as a result of the court's ruling, there was evidence that NWL did not refund the surrender charge but no evidence that NWL *chose* not to do so, which would support a claim of ratification.[12]

Additionally, as Burns testified, when a lawsuit regarding the conduct of an agent is filed, the legal department of NWL "puts a hold on everything," including the process for terminating an agent. The agent would be "flagged," and NWL would not accept any additional business from the agent. Accordingly, Pantaleoni was flagged when NWL first learned of the litigation Williams instituted and could no longer place business with the company, which effectively terminated his appointment by NWL.

---

[12] Williams added NWL as a defendant on May 24, 2018. On August 22, 2018, NWL served a Code of Civil Procedure section 998 offer to compromise in the amount of $16,000. This offer, the first of multiple offers to compromise, was specifically intended and calculated to compensate Williams for the surrender charge.

44

Based on these facts, we conclude there was insufficient evidence in the record from which a reasonable fact finder could find it highly probable that NWL ratified, i.e., adopted and approved of Pantaleoni's conduct after Perez and Burns learned of it from Williams' lawsuit. Rather, NWL attempted to refund the surrender charge and cut off Pantaleoni from placing new business, actions that would naturally result from NWL accepting the validity of Williams' allegations regarding Pantaleoni's malicious and outrageous conduct, but not accepting, adopting or approving Pantaleoni's conduct.

In sum, we have reviewed the record for evidence from which a jury could have found that an officer, director or managing agent responsible for corporate policy had the requisite knowledge to support a punitive damage award. We have found none. (See *Morgan, supra*, 60 Cal.App.5th at p. 1091.) The jury's verdict awarding punitive damages must be reversed.

## D. Attorney Fee Award

NWL contends that the attorney fee award should be reversed if we reverse Williams' elder abuse claim. We have upheld the elder abuse claim, so we consider NWL's alternative argument that we should remand to the trial court for recalculation of attorney fees if we reverse or reduce any of Williams' damage claims. We agree that because we reverse the bulk of the total damages awarded, the trial court should have the opportunity to reconsider the reasonableness of attorney fees sought. (See *Greenwich S.F., LLC v. Wong* (2010) 190 Cal.App.4th 739, 768 [case remanded for trial court to reconsider attorney fee award after $600,000 in damages reversed]; see also *Maldonado v. Epsilon Plastics, Inc.* (2018) 22 Cal.App.5th 1308, 1337.) We do not address whether the remaining damages would support the fee award. That issue is for the trial court to decide in the first instance.[13] (*Greenwich, supra*, at p. 768.)

---

[13] In his petition for rehearing, Williams argues that in *Weeks v. Baker & McKenzie, supra*, 63 Cal.App.4th at page 1176, the court found a punitive damages award was a

Williams cross-appeals the amount of attorney fees, contending that the trial court abused its discretion in refusing to award attorney fees based on his counsel's "home market hourly rates" in San Diego. In calculating the "lodestar" award, the trial court used an hourly rate of $500 for plaintiff's counsel, Frank Fox, instead of his "normal hourly rate of $765."

In awarding attorney fees, California courts use the lodestar approach, "i.e., the number of hours reasonably expended multiplied by the reasonable hourly rate." (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095 (*PLCM Group*); *Doppes v. Bentley Motors, Inc.* (2009) 174 Cal.App.4th 967, 997.)

"The reasonable hourly rate is that prevailing in the community for similar work." (*PLCM Group, supra*, 22 Cal.4th at p. 1095.) "The relevant 'community' is that where the court is located." (*Altavion, Inc. v. Konica Minolta Systems Laboratory, Inc*. (2014) 226 Cal.App.4th 26, 71; *MBNA America Bank, N.A. v. Gorman* (2006) 147 Cal.App.4th Supp. 1, 13 ["determination of market rate is generally based on the rates prevalent in the community where the services are rendered, i.e., where the court is located"].) "[A] court's use of reasonable rates in the local community, as an integral part of the initial lodestar equation, is one of the means of providing some objectivity to the process of determining reasonable attorney fees. Such objectivity is ' " 'vital to the prestige of the

---

" 'windfall' " to the plaintiff and did not justify the "enhancement" of a lodestar multiplier of 1.7. Relying on *Weeks*, Williams contends that a reversal of punitive damages does not justify remand to the trial court to reconsider and potentially reduce the attorney fee award, since punitive damages cannot enhance an attorney fee award. However, in *Harman v. City and County of San Francisco* (2006) 136 Cal.App.4th 1279, 1315, the court quoted *McGinnis v. Kentucky Fried Chicken of California* (9th Cir. 1994) 51 F.3d 805, where the court reversed punitive damages and remanded for reconsideration of attorney fees, reasoning that " '[w]hat the lawyers do for their actual client is an important measure of "extent of success." The district court must reduce the attorneys fees award so that it is commensurate with the extent of the plaintiff's success.' " (*Harman*, at p. 1315, quoting *McGinnis*, at p. 810.)

bar and the courts.' " ' [Citations.]" (*Nichols v. City of Taft* (2007) 155 Cal.App.4th 1233, 1243.)

" 'The court may rely on its own knowledge and familiarity with the legal market in setting a reasonable hourly rate. [Citation.]' [Citation.]" (*Nishiki v. Danko Meredith, P.C.* (2018) 25 Cal.App.5th 883, 898.)[14] "The courts repeatedly have stated that the trial court is in the best position to value the services rendered by the attorneys in his or her courtroom [citation], and this includes the determination of the hourly rate that will be used in the lodestar calculus." (*569 East County Boulevard LLC v. Backcountry Against the Dump, Inc.* (2016) 6 Cal.App.5th 426, 437.) For that reason, while the trial judge's determination is subject to review, " ' "it will not be disturbed unless the appellate court is convinced that it is clearly wrong." ' [Citation.]" (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132.)

"[I]n the unusual circumstance that local counsel is unavailable" or, put another way, "hiring local counsel was impracticable," the trial court may use the rate of counsel from a higher fee market in determining a reasonable hourly rate. (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 399 (*Horsford*).) In *Horsford*, the plaintiff submitted an uncontradicted declaration that he was unsuccessful in obtaining local lawyers in Fresno to represent him before turning to a San Francisco lawyer. The Court of Appeal held that the trial court abused its discretion in using local Fresno rates. (*Id.* at pp. 397-399; see also *Center for Biological Diversity v. County of San Bernardino* (2010) 188 Cal.App.4th 603, 618-619 [a plaintiff's declaration that no local attorneys in San Bernardino practicing environmental law on behalf of environmental groups will do so for a reduced fee or on a contingent basis, and possess

---

**14** At the hearing on plaintiff counsel's attorney fee, the trial court commented: "I don't know an attorney in Butte County who is billing $750 an hour, let's put it that way."

47

requisite expertise, was a sufficient showing that hiring qualified counsel in the area was impracticable]; *Environmental Protection Information Center v. Department of Forestry & Fire Protection* (2010) 190 Cal.App.4th 217, 249 [affirming trial court's use of out-of-town rates where the plaintiffs submitted a declaration from a local lawyer that he would not undertake primary representation in the suit and knew of no local counsel who would, as well as declarations from other local attorneys that would not have been willing to represent the plaintiffs at all].)

Here, Williams stated in his declaration that he contacted the district attorney and met with a local paralegal and an attorney to try to get documents from Pantaleoni but they were unable to help him. Then Williams met with an attorney for Northern California Legal Services, who could not take his case but referred Williams to Cole. Besides writing a letter on Williams' behalf to obtain documents from NWL, Cole tried to find an attorney for Williams through his organization, California Advocates for Nursing Home Reform. After speaking with Cole, a lawyer from San Francisco called Williams, asked him some questions, but declined to take the case. At that point, as Williams stated: "I got frustrated and gave up."

Cole stated in his declaration in support of an attorney fee award that he administers the lawyer referral service for California Advocates for Nursing Home Reform and helped develop a panel dedicated to assisting victims of financial elder abuse, which included Fox and 20 other lawyers at the time Cole referred Williams to Fox. California Advocates for Nursing Home Reform receives a 15 percent referral fee from any attorney fee recovered in a referred matter. Cole referred Williams to one San Francisco-based attorney who did not take the case. Cole's attempt to find another lawyer from Northern California "was unsuccessful because of the relatively small economic losses involved and Mr. Williams's inability to pay by the hour or even advance necessary costs." Cole referred Williams to Fox in San Diego, the only attorney

on the panel Cole could find who was willing to take the matter on a contingency basis and advance costs.

In opposition to Williams' motion for attorney fees, NWL submitted the declarations of six attorneys with elder law experience, all of whom stated that they would have taken the case if contacted. For example, the declaration from Dave C. Jones stated that he: is the senior trial lawyer at his firm; has litigated numerous financial elder abuse cases in counties from San Diego to Shasta, including Butte; and will take a contingency case where the financial injury is low but he perceives the injustice to be great. Jones further stated that, having reviewed the pleadings and jury instructions in this case, he was qualified and available to take the case and would have taken it if given the opportunity. Jones also stated that he was aware of five law firms in Butte and Sacramento counties and other firms in the Bay Area qualified to litigate a financial elder abuse case and would do so for less than a $765 hourly rate.

The other declarations were in a similar vein. Edward W. Goldkuhl declared that he had served as an expert witness in financial elder abuse cases. The hourly rates of these declarant attorneys ranged from $350 to $500 per hour.

Williams counters that the declarant attorneys were located in Sacramento and Contra Costa counties, which are not "contiguous" to Butte County, and none had offices in Butte County or Chico where the case was tried. Cole submitted a reply declaration in which he stated that none of the declarant attorneys was on his organization's financial elder abuse panel; "however, having received attestations of their interest in handling elder financial abuse matters involving low economic losses, I will be sending them an application to join that panel."

Citing *Horsford*, Williams argues that "when a prevailing party's attorney has a home office in a different market where rates are higher, the attorney is *entitled* to home market hourly rates if the party either made a 'good faith effort' to find local counsel or showed that retaining local counsel was 'impracticable.' " (Italics added.) Not so. The

court in *Horsford* said, "we doubt a plaintiff needs to make anything more than 'a good faith effort to find local counsel' [citation] in order to *justify* the fees of out-of-town counsel . . . ." (*Horsford, supra*, 132 Cal.App.4th at p. 399, italics added; see also *In re Tobacco Cases I* (2013) 216 Cal.App.4th 570, 582 ["The court has the *discretion* to make an exception [to local rates] . . . when the prevailing party shows it was impracticable to use local counsel" (italics added)]; Cal. Judges Benchbook: Civil Proceedings—Trial (CJER June 2021 update) § 16.100 ["When local counsel is unavailable, the judge has the *discretion to consider* an out-of-town attorney's higher rates" (italics added)].) In other words, on a sufficient showing of the unusual circumstance that local counsel is not available, the trial court is not limited to the use of local hourly rates and has discretion to use higher rates from counsel's home market. It is an abuse of discretion only "to fail even to consider an hourly rate based on counsel's 'home' market rate." (*Horsford, supra*, 132 Cal.App.4th at p. 399; *Caldera v. Department of Corrections & Rehabilitation* (2020) 48 Cal.App.5th 601, 609 (*Caldera*) ["When a plaintiff needs to hire out-of-town counsel, a trial court must consider *counsel's* 'home market rate' when setting the hourly rate, rather than the local market rate"].)

We cannot conclude that the trial court abused its discretion under the principles articulated in *Horsford* and its progeny. To begin with, the trial court did not err, as Williams claims, "applying Butte County rather than San Diego County hourly rates." To the contrary, Williams' argument was that the attorneys who submitted declarations in support of NWL's opposition to his attorney fee motion were not local to Butte County, but from Sacramento and the Bay Area, both of which are major metropolitan areas. Thus, the $350 to $500 hourly rates these attorneys quoted represent rates for financial elder abuse cases in higher-fee markets than Butte County. The rate the court ultimately used for the lodestar calculation was the highest of these.

Nor is there evidence that the court refused to consider Fox's home market rate. The court's passing comment that it was unaware of any lawyer in Butte County charging

50

$750 an hour does not equate to refusal to consider his rate. (Cf. *Caldera, supra*, 48 Cal.App.5th at pp. 610-611 ["[T]he trial court rejected Caldera's request of $750 per hours because it was 'too high for this locale,' " and "lowered the hourly rate to $550 per hour, which the court stated was at the top of local rate for counsel in San Bernardino County ($450 to $550 per hour)"].)

Moreover, the evidence before the trial court in *Horsford* was "overwhelming and uncontradicted" the plaintiff could not find a local lawyer to take the case (*Horsford, supra*, 132 Cal.App.4th at pp. 398-399), while here the evidence of Williams' attempt to find a lawyer with experience and expertise in financial elder abuse was for the most part limited to Cole's efforts and contradicted by the declarations NWL submitted.

Therefore, our remand to the trial court is for the limited purpose of reconsidering the attorney fee award, if the court chooses, in light of the reversal of punitive damages. We find no abuse of discretion in the trial court's use of a $500 hourly rate in the lodestar calculation.

## DISPOSITION

The award of punitive damages is reversed.  We remand this case to the trial court to reconsider the attorney fee award in light of the reversal of punitive damages.  The judgment is otherwise affirmed.  Williams shall recover his costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1), (2).)


                                                    _____/s/_____
                                                    RAYE, P. J.



We concur:



_____/s/_____
ROBIE, J.



_____/s/_____
MURRAY, J.[*]



_____

[*]      Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.